TOPLIFF v. TOPLIFF AND ANOTHER.

TOPLIFF AND ANOTHER v. TOPLIFF.

APPEALS FROM THE CIRCUIT COURT. OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF OHIO.

Nos. 220, 277.   Argued April 5, 1892. — Decided May 2, 1892.

Letters patent No. 108,085, issued October 11, 1870, to John B. Augur for an improvement for gearing in wagons was not anticipated by the invention patented to C. C. Stringfellow and D. W. Surles, by letters patent No. 31,134, dated January 15, 1861, and are valid, so far as that invention is concerned.

It is not sufficient, in order to constitute an anticipation of a patented invention, that the device relied upon might, by modification, be made to accomplish the function performed by that invention, if it were not designed by its maker, nor adapted, nor actually used for the performance of such function.

In view of the extensive use to which the invention secured to John H. Topliff and George H. Ely by letters patent No. 122,079 for an improvement in connected carriage springs, reissued March 28, 1876, No. 7017, the invention secured thereby is held to have patentable novelty, although the question is by no means free from doubt.

The first reissue of that patent, being to correct a palpable and gross mistake, and being made within four months after the date of the original patent, was within the power of the Commissioner of Patents.

The second reissue of that patent is valid, whether it be an enlargement of the original patent or not.

Miller v. Brass Co., 104 U. S. 350, was not intended to settle a principle that under no circumstances would a reissue containing a broader claim than the original be supported.

The power to reissue a patent may be exercised when the original patent is inoperative by reason of the fact that its specification was defective or insufficient, or the claims were narrower than the actual invention of the patentee, provided the error has arisen from inadvertence or mistake, and the patentee is guilty of no fraud or deception; but such reissues are subject to the following qualifications:

(1) That it shall be for the same invention as the original patent, as such invention appears from the specification and claims of such original;

(2) That due diligence must be exercised in discovering the mistake in the original patent, and that, if it be sought for the purpose of enlarging the claim, the lapse of two years will ordinarily, though

Statement of the Case.

not always, be treated as evidence of an abandonment of the new matter to the public to the same extent that a failure by the inventor to apply for a patent within two years from the public use or sale of his invention is regarded by the statute as conclusive evidence of an abandonment of the patent to the public;

(3) That this court will not review the decision of the Commissioner upon the question of inadvertence, accident or mistake, unless the matter is manifest from the record; but that the question whether the application was made within a reasonable time is, in most, if not in all such cases, a question of law for the court.

Objections to a master's report should be taken in the court below; and if not taken there, cannot be taken here for the first time.

The allowance of an increase of damages, under the statute, to the plaintiff in a suit for the infringement of letters patent rests somewhat in the discretion of the court below, and its finding on this point will not be disturbed unless the evidence clearly demands it.

THE court stated the case as follows:

This was a bill in equity for the infringement of three patents, namely: (1) Patent No. 108,085, issued October 11, 1870, to John B. Augur, for an improvement in gearing for wagons. (2) Patent No. 123,937, issued February 20, 1872, to Cyrus W. Saladee, for an improvement in carriage-springs and mode of attachment. (3) Patent No. 122,079, issued December 19, 1871, to John A. Topliff and George H. Ely, for an improvement in connecting carriage-springs; reissued March 28, 1876, No. 7017.

The patent to Augur consisted in a mode of equalizing the pressure upon two carriage-springs by "connecting together by a rigid rod the two pivoted links upon the clips employed on the hind axle, so that when the weight is upon one spring, both springs, by reason of the connecting-rod, shall be caused to work together, thus preventing the roll." The effect of this device is such that if a heavy weight is thrown upon one spring, as for instance by a person getting into a buggy at one side, the pressure is borne equally by both springs. The claims alleged to be infringed were the following:

"1. The herein-described method of equalizing the action of springs of vehicles and distributing the weight of the load.

"2. The combination of the pivoted links with a rod con-

necting the same, the rod compelling both links to move in unison, as and for the purpose described."

The reissued patent to Topliff and Ely, as stated by the patentees, "relates to side half-elliptic spring vehicles, and has for its object suspending the front and rear ends of the springs directly to the rear axle and front bolster of the running gear by means of two separate connecting-rods, the outer ends of which have formed upon them, as a part of the same, and at right angles with the rod, short arms, between which the ends of the springs, respectively, are secured and operated, the connecting-rod receiving the rear ends of the springs being hinged to the rear axle, while the rod receiving the front ends of the springs is, in like manner, connected to the front bolster in such manner that the vibration of the springs will impart a corresponding rotation to the connecting-rods front and back, and so that the depression of either spring will, by the rotary action imparted to the connecting-rod, compel a corresponding depression of the other, and thus compel both springs to vibrate together, and move in unison one with the other, equalizing their action and the weight imposed upon them, as well as to prevent side motion to' the body of the vehicle."

. There were but two claims to this patent, which read as follows:

"1. The combination of two connecting-rods located at the front and rear ends of a wagon-body, and arranged to turn in their bearings, with a pair of half-elliptic springs, whereby the springs are caused to yield in unison with each other, substantially as and for the purpose set forth.

"2. The combination of the connecting-rods BB' provided with arms at their ends, with the half-elliptic springs AA', substantially as and for the purpose set forth."

The answer admitted that the defendant had manufactured and sold connecting-rods for carriages substantially like those manufactured by the plaintiffs, and claimed the right so to do, alleging that plaintiffs' patents were both void for want of novelty; and that the reissued patent of Topliff and Ely was not for the same invention as the original; and denied that

his manufacture infringed in any way upon any right which plaintiffs had to the invention.

The case was heard in the court below upon pleadings and proofs, the court holding that the Augur patent and the Top-liff and Ely reissue were good and valid; and that the defendant was guilty of infringement. An injunction was allowed and the case was referred to a master to take an account of profits and damages. The master reported the sum of $8480.54 to be due the plaintiffs from the defendant as damages for the infringement, and a final decree was entered for that amount, from which both parties appealed to this court.

*Mr. Henry S. Sherman* for Topliff and another.

*Mr. W. W. Boynton* (with whom were *Mr. John C. Hale* and *Mr. M. D. Leggett* on the brief) for Topliff.

MR. JUSTICE BROWN delivered the opinion of the court.

As the court below failed to pass upon the Saladee patent in its decree, and as neither party has assigned this omission as error, it is unnecessary to take it into consideration upon this appeal. There are really but two questions involved in this case: (1) the validity of the Augur patent, in view of the state of the art; (2) the validity of the Topliff and Ely reissue.

(1) In the Augur patent the device described consists of a rod attached to the rear axle of a side-spring buggy or other vehicle, having two links rigidly attached to the rod, one at each end thereof, upon which the rear ends of such side-springs are pivoted. The result is that when one spring is depressed, as by a person stepping into the vehicle on one side, the spring upon the other side is also depressed, through the action of the rod connecting the two, so that the body of the vehicle is kept approximately upon a level.

The patents to Stowe of 1868 and to Sexton of 1868 were also for a method of equalizing the action of side-springs by so connecting, as stated in the Stowe patent, "the two side-springs of a carriage that a weight placed on any portion of the carriage will depress each side equally, and prevent the

strain to the springs occasioned by the frequent wrenching they are subjected to in getting in and out of the carriage." But the means for accomplishing this in both cases are so wholly dissimilar to those described in the patents in suit that a comparison can hardly be made of them.

Indeed, the patent to Stringfellow and Surles of 1861 approximates so much more nearly to the patents in suit that it is the only one worthy of serious consideration. If this patent does not anticipate the Augur patent, none of the others do; if it does anticipate it, it is of no consequence whether the others do or not. This patent is for "a novel improvement in hanging carriage-bodies on springs and from C-shaped jacks or supports, whereby the body is allowed a free and easy vibration longitudinally, and it is relieved from sudden and disagreeable jolts and jerks in travelling on rough roads or from the sudden starting of the horse. The parts are also so braced and strengthened that all liability to twist the carriage-body is effectively prevented. The invention consists of a combination of transverse tie-rods with the side-springs, which are hung by shackle-bars or jointed links from C-shaped supports." The patentee further states: "It will thus be seen that the springs DD are suspended in such a manner from the four supports CCC'C' that the body of the carriage, which is mounted on said springs, will be allowed to have a free, swinging motion backwards or forwards, and in consequence of the springs being hung by the shackle-bars EEEE the springs will also have an upward movement. . . . In uniting the shackle-bars to the ends of the springs DD and the supports CCC'C' two tie-bars, GG, with forked ends, one of which is shown in Fig. 2 of the drawing, are used for the purpose of bracing the supports CC', and also the ends of the springs DD, so as to prevent the swaying of the carriage-body from twisting or bending the supports CC' laterally." The claim was for "the transverse ties GG, arranged and operated substantially as and for the purposes specified."

If there be anything in this patent which anticipates the connecting-rods of the Augur device it is the transverse tie-bars GG, upon which the springs are hung, which the specifi-

cation states are used for bracing the supports CC' and also the ends of the springs DD, so as to prevent the swaying of the carriage-body from twisting or bending the supports CC' laterally. An inspection of the models of this patent put in evidence shows at once that the object of these tie-bars is not an equalization of the pressure upon the springs, but to secure an equality in the backward and forward swinging movement in the body of the vehicle. Indeed, this was obviously necessary, as the patentee states, to prevent the body of the carriage and the supports CC' from being twisted, the entire object of the patent being to secure a free and easy vibration longitudinally. It is true that one of the models of the patent put in evidence (Exhibit M), does, by its peculiar construction in shortening the links and strengthening and stiffening the entire structure, show an equalization of the pressure upon the springs, but it is accomplished by sacrificing the swinging movement backward and forward, which it was the object of the patent to secure. The duplicate of the model from the Patent Office contains no suggestion of this kind, nor do the other models of the same patent offered in evidence. While it is possible that the Stringfellow and Surles patent might, by a slight modification, be made to perform the function of equalizing the springs which it was the object of the Augur patent to secure, that was evidently not in the mind of the patentees, and the patent is inoperative for that purpose. Their device evidently approached very near the idea of an equalizer; but this idea did not apparently dawn upon them, nor was there anything in their patent which would have suggested it to a mechanic of ordinary intelligence, unless he were examining it for that purpose. It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions.

(2) The Topliff and Ely patent is claimed to be fully anticipated by the Augur device. In their specification the patentees admit that the connecting-rods placed at right angles across the front and rear of the running gear of vehicles, and

hinged to the front bolster and rear axle, are an old device. The better to illustrate the distinction between their own invention and all others pertaining to the use of connecting-rods, they cite several patents, among which is that of Augur, of which they state as follows:

"In this patent side-springs are used, the front ends of which are hinged upon fixed and rigid standards secured upon the top of the front bolster, and where the front ends of the spring are firmly held in a central position over said bolster, while the rear ends are hinged to hinges secured to the outer ends of a single connecting-rod placed over the top of the rear axle in such a manner that, as the springs are lengthened by depression, a corresponding rotation is imparted to the connecting-rod. In this case provision for the lengthening of the springs when depressed or in motion is only made for the rear ends of the springs, the front ends being firmly held over the centre of the bolster; and hence, as the load upon the springs is increased, and as only their rear ends, in combination with said links and connecting-rod, are permitted to accommodate their vibration, the rear end of the body is caused to have a backward tipping motion — that is, the back end of the body is thrown lower than the front end, when the springs are depressed to their full capacity — which is an objectionable feature in this device for equalizing the action of springs; besides, as only the rear ends of the springs are allowed to act, that easy and natural motion of the springs which is only had by allowing both ends to act freely is in a great measure lost.

"The radical difference of our invention from each and all the cases above cited is, first, in the construction of the connecting-rod," (which is in reality precisely the same as that employed by Augur;) "and, secondly, in suspending both ends of the springs upon separate connecting-rods, and thus allow both ends of the springs to act freely and in harmony with their vibrating motion, to which is added the other important advantage, viz.: that arrangement of connecting-rods admits of their application to side-spring vehicles of the ordinary kind now in use as readily as to those built expressly for the purpose — an advantage not attained by any other pre-

viously known combination of connecting-rods with the springs or bodies of vehicles."

It is quite evident from an examination of this patent that "the connecting-rods BB', provided with arms at their ends," are precisely the same in structure, design and operation as "the pivoted links with a rod connecting the same," described in the second claim of the Augur patent; and that the only substantial difference in the construction of the two devices is in the duplication of this rod by applying it to the front bolster as well as to the rear axle, and thereby enabling it to be applied to side-spring vehicles of the ordinary kind, as readily as to those built expressly for the purpose. It is true there are introduced into the claims of the Topliff and Ely patent the half-elliptic springs AA', which, by means of the connecting-rods, are caused to yield in unison with each other; but the same springs are evidently to be read into the Augur patent, since the whole object of the device, as stated by him, is to equalize the action of the springs by compelling both links to move in unison. If this patent differed from the other merely in duplicating the rod and applying it to the front bolster as well as to the rear axle, it is conceded that it would not, under the cases of *Dunbar* v. *Myers*, 94 U. S. 187, 195, and *Slawson* v. *Grand Street Railroad Co.*, 107 U. S. 649, 653, involve invention.

But there is a further distinction between the two devices which ought not to be overlooked. Under the Augur patent, the front ends of the springs are supported upon standards rising from the bolster, and the rear ends upon the links of the connecting-rod, rising perpendicularly above the rear axle. In other words, the links are turned upward, instead of down. This arrangement would evidently be inoperative if the springs were hung at both ends upon links, so placed, since the body of the vehicle would fall down at once upon the axles. In the Topliff and Ely patent, to obviate this, and to enable the device to be applied at both ends of the springs, the links are turned horizontally, or somewhat dependent, so that the springs can rest upon them at both ends, and thus secure a more perfect equalization. Trifling as this deviation seems to

be, it renders it possible to adapt the Augur device to any side-spring wagon of ordinary construction.

While the question of patentable novelty in this device is by no means free from doubt, we are inclined, in view of the extensive use to which these springs have been put by manufacturers of wagons, to resolve that doubt in favor of the patentees, and sustain the patent.

(3) With regard to the reissue of this patent, the record shows that on April 9, 1872, within four months from the date of the original patent, a reissue was granted, in which the specification was largely reframed, the drawings changed in form, though apparently not in substance, but the claim was changed only by providing that the connecting-rods should be "secured directly to the hind axle and front bolster," instead of "to the front and rear axles," as provided in the claim of the original patent. The claim of the original and first reissue are as follows :

| *Original.* | *First Reissue.* |
|---|---|
| " The arms CCC'C' arranged upon separate *rock*-rods BB' secured directly to the *front and rear axles* to cause both ends of *each spring* to yield simultaneously and in unison with each other, *and also to be laterally braced by said rock-rods,* as described." | " The arms CCC'C' arranged upon separate *connecting*-rods, BB' secured directly to the *hind axle* and *front bolster*, to cause both ends of *the side-springs* to yield simultaneously and in unison with each other, *in the manner shown* and described." |

The original claim was, in the particular above mentioned, a clear mistake, since affixing the connecting-rod and springs to the front axle would render it impossible to be turned, and in addition to this, the original drawing shows it affixed to the bolster. The correction of a mistake so clear, made within so short time after the issue of the original patent, was undoubtedly within the power of the Commissioner, as defined by Rev. Stat. section 4916. The lateral bracing by the rock-rods mentioned in the claim of the original patent was a merely inci-

dental function to the operation of the rock-rod in securing the axle to the spring, and their omission cannot be considered an enlargement of the claim.

The second reissue was applied for a little more than a month after the first was granted, although the patent was not granted upon this application until March 28, 1876, nearly four years after the application was filed. No change from the first reissue was made in the drawings or specification in this reissue, but the claim was divided and changed so as to read as follows:

"1. The combination of two connecting-rods located at the front and rear ends of a wagon-body, and arranged to turn in their bearings, with a pair of half-elliptic springs, whereby the springs are caused to yield in unison with each other, substantially as and for the purpose set forth.

"2. The combination of the connecting-rods BB' provided with arms at their ends, with the half-elliptic springs AA', substantially as and for the purpose set forth."

The first claim of this reissue is not insisted upon in this case, so that the question of its validity need not now be considered. The second claim is to some extent a change of the claim of the first reissue. It omits the requirement that the connecting-rod shall be secured directly to the axle and bolster, so as to cause both ends of the side-springs to yield simultaneously, and introduces the half-elliptic springs AA' as a new element of the combination. Whether this be an enlargement of the original claim or not, it is for substantially the same invention, and in view of the fact that the reissue was applied for as soon as the mistake was discovered, and before any rights in favor of third parties could be reasonably expected to have attached, or had in fact attached, we think this reissue is not open to the objections which have proved fatal to so many since the case of *Miller* v. *Brass Company*, 104 U. S. 350, was decided.

It is a mistake to suppose that that case was intended to settle the principle that, under no circumstances, would a reissue containing a broader claim than the original be supported. We have no desire to modify in any respect the views ex-

pressed in that and subsequent cases with regard to the validity of reissues. There is no doubt, as was said by this court in *Powder Company* v. *Powder Works*, 98 U. S. 126, 137, 138, that a reissue can only be granted for the same invention which formed the subject of the original patent, of which it is a reissue, since, as was said by the court in that case, the express words of the act are "a new patent for the same invention." "The specification may be amended so as to make it more clear and distinct; the claim may be modified so as to make it more conformable to the exact rights of the patentee, but the invention must be the same. . . . This prohibition is general, relating to all patents; and by 'new matter' we suppose to be meant new substantive matter, such as would have the effect of changing the invention, or of introducing what might be the subject of another application for a patent. The danger to be provided against was the temptation to amend a patent so as to cover improvements which might have come into use, or might have been invented by others, after its issue."

In the case of *Miller* v. *Brass Company*, 104 U. S. 350, 351, a reissue with expanded claims was applied for *fifteen years* after the original patent was granted. It was held to be manifest upon the face of the patent that the suggestion of inadvertence and mistake was a mere pretence, or, if not a pretence, that the mistake was so obvious as to be instantly discernible on the opening of the patent, and the right to have it corrected was abandoned and lost by unreasonable delay. "The only mistake suggested," said Mr. Justice Bradley, "is, that the claim was not as broad as it might have been. This mistake, if it was a mistake, was apparent upon the first inspection of the patent, and if any correction was desired, it should have been applied for immediately." It was intimated in that case, p. 352, although the facts did not call for an adjudication upon the point, that "if two years' public enjoyment of an invention with the consent and allowance of the inventor is evidence of abandonment and a bar to an application for a patent, a public disclaimer in the patent itself should be construed equally favorable to the

public. · Nothing but a clear mistake or inadvertence, and a speedy application for its correction, is admissible when it is sought merely to enlarge the claim." It was further said that the section of the Revised Statutes does not in terms authorize a reissue to enable a patentee to expand his claim, and that it was natural to conclude that the reissue of a patent for such purposes was not in ·the mind of Congress when it passed the laws in question. "At all events," said the court, p. 354, "we think it clear that it was not the special purpose of the legislation on this subject to authorize the surrender of patents for the purpose of reissuing them with broader and more comprehensive claims, although, under the general terms of the law, such a reissue may be made when it clearly appears that an actual mistake has inadvertently been made. . . . Now, whilst, as before stated, we do not deny that a claim may be enlarged in a reissued patent, we are of the opinion that this can only be done when an actual mistake has occurred ; not from a mere error of judgment (for that may be rectified by appeal), but a real *bona fide* mistake, inadvertently committed ; such as a Court of Chancery, in cases within its ordinary jurisdiction, would correct. . . . The granting of a reissue for such a purpose, after an unreasonable delay, is clearly an abuse of the power to grant reissues, and may justly be declared illegal and void."

So, in the case of *Johnson* v. *Railroad Company*, 105 U. S. 539, 547, the patent was issued in 1857, and at the expiration of the original term of fourteen years an extension of seven years was granted, and a reissue was applied for after a lapse of fifteen years, and it was held, upon the authority of *Miller* v. *Brass Company*, that if the patentee had the right to a reissue if applied for in reasonable time, he had lost it by his unreasonable delay. Said the court, speaking by Mr. Justice Woods: "He has rested supinely until the use of the fish-plate joint has become universal, and then, after a lapse of fifteen years, has attempted by a reissue to extend his patent to cover it. We think it is perfectly clear that the original patent could not be fairly construed· to embrace the device used by the appellee, which appellants insist is covered by

their reissue.  If the reissued patent covers it, it is broader than the original, and is, therefore, void."

In the case of *Mahn* v. *Harwood*, 112 U. S. 354, 358, a patent reissued nearly four years after the date of the original patent was held to be invalid as to the new claims, upon the ground of unreasonable delay in applying for it, the only object of the reissue being to enlarge the claims.  Nothing was changed, but to multiply the claims and make them broader and this was done, not for the benefit of the original patentee, but for that of his assignees.  "It was not intended then," said Mr. Justice Bradley, referring to *Miller* v. *Brass Co.*, "and is not now, to question the conclusiveness, in suits for infringements of patents, of the decisions of the Commissioner on questions of fact necessary to be decided before issuing such patents, except as the statute gives specific defences in that regard."  He repeated substantially what had been said in *Miller* v. *Brass Co.*, that "a patent for an invention cannot lawfully be reissued for the mere purpose of enlarging the claim, unless there has been a clear mistake inadvertently committed in the wording of the claim, and the application for a reissue is made within a reasonably short period after the original patent was granted.  The granting of such reissues after the lapse of long periods of time is an abuse of power, and is founded on a total misconception of the law."  It was held that while lapses of time might be of small consequence where the original claim was too broad, and the patentee sought to restrict it, there were substantial reasons why the claim could not be enlarged unless the patentee used due diligence to ascertain his mistake.  "The rights of the public here intervene, which are totally inconsistent with such tardy reissues; and the great opportunity and temptation to commit fraud after any considerable lapse of time, when the circumstances of the original application have passed out of mind, and the monopoly has proved to be of great value, make it imperative on the courts, as a dictate of justice and public policy, to hold the patentees strictly to the rule of reasonable diligence in making applications for this kind of reissues."  It was further held that while it was for

the Commissioner of Patents to determine the question of inadvertence, accident or mistake, the question of reasonable time was one which the court could determine as one of law, by comparing the patent itself with the original patent, and, if necessary, with the record of its inception.

In speaking of the case of *Miller* v. *Brass Co.*, Mr. Justice Bradley observed : " We suggested that a delay of two years in applying for such correction should be construed equally favorable to the public. But this was a mere suggestion by the way, and was not intended to lay down any general rule. Nevertheless, the analogy is an apposite one, and we think that excuse for any longer delay than that should be made manifest by the special circumstances of the case."

In the large number of cases which have come up to this court since that of *Mahn* v. *Harwood* was decided, in which reissues have been held to be invalid, it will be found that the opinion of the court was put upon the ground, either that the patentee had been guilty of inexcusable laches, usually of from four to sixteen years, or that circumstances had occurred since the granting of the original patent which made the reissue operate harshly or unjustly to the defendant in the case.

Thus, in *Mathews* v. *Machine Co.*, 105 U. S. 54, there was a delay of fourteen years ; in *Bantz* v. *Frantz*, 105 U. S. 160, a delay of fourteen years and six months ; in *Wing* v. *Anthony*, 106 U. S. 142, of over five years ; in *Moffit* v. *Rogers*, 106 U. S. 423, of two years and seven months ; in *Gage* v. *Herring*, 107 U. S. 640, of fourteen years ; in *Clements* v. *Odorless Apparatus Co.*, 109 U. S. 641, of nearly five years ; in *McMurray* v. *Mallory*, 111 U. S. 97, of nine years; in *White* v. *Dunbar*, 119 U. S. 47, of five years. In *Parker & Whipple Co.* v. *Yale Clock Co.*, 123 U. S. 87, there was a delay of one year and eight months, but it appeared that the improvements not covered by the original patent had been brought into use by others than the patentee before the reissue was applied for. In *Coon* v. *Wilson*, 113 U. S. 268, a reissue was applied for only a little over three months after the original patent was granted ; but the patentee waited until the defendants produced their

device and then applied for such enlarged claims as to embrace this device, which was not covered by the claim of the original patent, and it was apparent from a comparison of the two patents that the application for a reissue was made merely to enlarge the scope of the original. In *Wollensak* v. *Reiher*, 115 U. S. 96, 101, there was a delay of more than five years, Mr. Justice Matthews observing that "the settled rule of decision is, that if it appears, in cases where the claim is merely expanded, that the delay has been for two years, or more, it is adjudged to invalidate the reissue, unless the delay is accounted for and excused by special circumstances, which show it to have been not unreasonable." In the very latest case decided by this court, viz.: *Electric-Gas Lighting Co.* v. *Boston Electric Co.*, 139 U. S. 481, there was a delay of eight and one-half years, and the sole object of the reissue was to expand the claims. In *Newton* v. *Furst and Bradley Co.*, 119 U. S. 373, there was a delay of more than thirteen years, and the defendant had begun in the meantime to make machines of the pattern complained of. In *Ives* v. *Sargent*, 119 U. S. 652, there was a delay of three years, and in the meantime the patent was infringed by a construction manufactured and sold without infringing the patent as originally granted. In *Worden* v. *Searls*, 121 U. S. 14, there was a delay of six years; and in *Matthews* v. *Ironclad Manufacturing Co.*, 124 U. S. 347, one of seven years.

From this summary of the authorities it may be regarded as the settled rule of this court that the power to reissue may be exercised when the patent is inoperative by reason of the fact that the specification as originally drawn was defective or insufficient, or the claims were narrower than the actual invention of the patentee, provided the error has arisen from inadvertence or mistake, and the patentee is guilty of no fraud or deception.; but that such reissues are subject to the following qualifications :

First. That it shall be for the same invention as the original patent, as such invention appears from the specification and claims of such original.

Second. That due diligence must be exercised in discover-

ing the mistake in the original patent, and that, if it be sought for the purpose of enlarging the claim, the lapse of two years will ordinarily, though not always, be treated as evidence of an abandonment of the new matter to the public to the same extent that a failure by the inventor to apply for a patent within two years from the public use or sale of his invention is regarded by the statute as conclusive evidence of an abandonment of the patent to the public.

Third. That this court will not review the decision of the Commissioner upon the question of inadvertence, accident or mistake, unless the matter is manifest from the record; but that the question whether the application was made within a reasonable time is, in most, if not in all such cases, a question of law for the court.

To hold that a patent can never be reissued for an enlarged claim would be not only to override the obvious intent of the statute, but would operate in many cases with great hardship upon the patentee. The specification and claims of a patent, particularly if the invention be at all complicated, constitute one of the most difficult legal instruments to draw with accuracy, and in view of the fact that valuable inventions are often placed in the hands of inexperienced persons to prepare such specifications and claims, it is no matter of surprise that the latter frequently fail to describe with requisite certainty the exact invention of the patentee, and err either in claiming that which the patentee had not in fact invented, or in omitting some element which was a valuable or essential part of his actual invention. Under such circumstances, it would be manifestly unjust to deny him the benefit of a reissue to secure to him his actual invention, provided it is evident that there has been a mistake and he has been guilty of no want of reasonable diligence in discovering it, and no third persons have in the meantime acquired the right to manufacture or sell what he had failed to claim. The object of the patent law is to secure to inventors a monopoly of what they have actually invented or discovered, and it ought not to be defeated by a too strict and technical adherence to the letter of the statute, or by the application of artificial rules of interpretation. The

evidence in this case shows that plaintiffs were conceded by manufacturers a monopoly of this invention; that defendant was the only one who had infringed their patents; and that he did not begin to manufacture the infringing device until 1882, six years after the second reissue was granted. In view of this and the fact that the second reissue was applied for within five months from the time the original patent was granted, and within thirty-seven days after the first reissue, and that it covers no more than the actual invention of the patentee, so far as the same is an improvement upon the Augur patent, we think it should be upheld.

(4) Defendant also assigns as error the allowance by the master of damages for the infringement of the Augur patent prior to April 9, 1884, when the plaintiffs first took title to it. It appears from the record that the patentee assigned the patent to one Atwater, on February 4, 1873, subject to the condition that if he paid a certain note of $2000 and interest the assignment was to be void. This vested the real title in the assignee. *Waterman* v. *McKenzie*, 138 U. S. 252. The assignment made no mention of past infringements. On April 9, 1883, Atwater assigned to Saladee all the interest which he had acquired, together with all claims and demands for the past use of such patents, and on April 9, 1884, Saladee made a similar assignment to the plaintiffs.

It is claimed in this connection, first, that the bill did not make the assignment of the claim for damages for prior infringements of the Augur patent a basis or ground of recovery and asked no recovery therefor; and, second, that, if the plaintiffs were entitled to recover the damages which Atwater sustained by reason of the infringement of this patent prior to April 9, 1883, and those which Saladee sustained from April 9, 1883, to April 9, 1884, the date of the assignment to the plaintiffs, there was no evidence that either Atwater or Saladee suffered any damages by reason of the infringement, nor any evidence that they could have supplied the trade during those years.

It is sufficient to say in reply to this, that no such exception was taken in the court below to the master's report, the only

exception being that, in view of the Stringfellow and Surles patent, the master should have reported only nominal damages. It was held by this court, in *Story* v. *Livingston*, 13 Pet. 359, 366, that proper practice in chancery requires that no exceptions to a master's report be made which were not taken before the master, the object being to save time and give him an opportunity to correct his errors or reconsider his opinion. A party neglecting to bring in objections cannot afterwards except to the report, unless the court, upon motion, see reason to be dissatisfied with the report and refer it to the master for review, with liberty to the party to take objection to it.　And in *McMicken* v. *Perin*, 18 How. 507, it was held directly that this court will not review a master's report upon objections taken here for the first time.　In affirmance of this principle, Rule 21 (Sub. 2) requires that "when the error alleged is to a ruling upon the report of a master, the specification shall state the exception to the report and the action of the court upon it."　This presupposes that the particular exception relied upon was taken in the court below, and was passed upon by the court adversely to the appellant.　Proper practice requires that objections to a master's report shall be taken in that court, that any errors discovered therein may be rectified by the court itself, or by a reference to the master for a correction of his report, without putting parties to the delay and expense of an appeal to this court.　It would be manifestly unjust if this court, after having affirmed the action of the court below in every other particular, should take up an error in a master's report which was not called to its attention, and reverse the case upon that ground, when if exception had been duly taken, the error could have been at once corrected.　There is nothing in this case to indicate that this point was ever made before the master, nor is it noticed in the eight exceptions taken to his first report, which was set aside upon other grounds, or, as already observed, in the exception to his final report.

(5) For the same reason, that no exceptions were taken at all by the plaintiffs to the master's report, we must decline to notice their first two assignments of error based upon the inadequacy of the damages awarded.

There is much force in the third assignment, that the court erred in overruling plaintiffs' motion to increase the damages, and in refusing to give a decree for such increase. The master finds that for some years before the defendant began to manufacture, he was the travelling sales agent of the plaintiffs; that while so associated in the manufacture of carriage hardware and appliances, they established a large trade in certain parts of the country; and that during this period, the defendant, while travelling for the firm, became acquainted with their trade, and the location, extent of purchase and solvency of their customers. His connection with the firm having terminated, defendant went to Cleveland, and in 1882 opened a rival establishment, and began the infringement of these patents. Before that time, plaintiffs were the exclusive manufacturers of these equalizers, and had equipped their establishment with sufficient machinery to enable them to supply the market; but they neither issued licenses nor established a royalty for the manufacture or use of their improvement. The defendant, knowing all their customers and plaintiffs' facilities for the manufacture of equalizers, made serious inroads upon their business, and sold almost exclusively to those who had formerly been customers of the plaintiffs. Under these circumstances, we should not have disturbed the decree of the court below, if it had seen fit to increase the damages; but in view of the fact that the defendant carried on the business apparently without profit to himself, and that a decree passed against him for the sum of $8480.51 actual damages, we are not inclined to reverse it upon that ground. The allowance of an increase of damages under the statute is a matter which rests somewhat in the discretion of the court, and we should not be inclined to disturb its finding upon this point, unless the evidence clearly demanded it.

The decree of the court below is, therefore,

*Affirmed.*