## NATIONAL MOTOR BEARING CO., Inc., v. CONSOLIDATED MOTOR PARTS, Inc.

### No. 7181.

District Court, E. D. New York.

May 23, 1935.

See, also (D. C.) 6 F. Supp. 811.

550

Frederick S. Duncan (J. L. Stackpole, of Boston, Mass., and Charles S. Wheeler, Jr., and A. Donham Owen, both of San Francisco, Cal., of counsel), for plaintiff.

Clarence M. Crews (Frank Parker Davis and Albert J. Fihe, both of Chicago, Ill., of counsel), for defendant.

MOSCOWITZ, District Judge.

This is an action brought on reissue patent No. 15,061, granted March 15, 1921, to the Cantrell-Miller Manufacturing Company of San Francisco, on an application for reissue filed November 10, 1920. The original patent No. 1,291,397 was granted January 14, 1919, to Cantrell & Miller on their application, filed September 5, 1917.

The subject-matter of the patent in suit and the claims in issue is an oil retainer. The oil retainer or seal of the patent is an annulus which is inserted in the rear axle of an automobile, or elsewhere, where it is desired to prevent the leakage of oil, to form an oil-tight joint between the surrounding housing and the rotating axle shaft.

The ownership of the patent by the plaintiff is established by the stipulated title papers.

The nominal defendant, the Consolidated Motor Parts Company, sells the infringing oil seals which are made by the Victor Manufacturing & Gasket Company, which is conducting the defense of the case.

The claims in suit are 8, 9, and 10, which read as follows:

"Claim 8. An oil retaining means including a pliant diaphragm having a sleeve extending from one side, and a ductile ring secured to the peripheral portion of the diaphram and adapted to be expressed into secure position of a contiguous support.

"Claim 9. An oil retaining means including a pliant diaphragm having a sleeve extending from one side, and a ductile ring secured to the peripheral portion of the diaphragm and adapted to be expressed into secure position on a contiguous support and form therewith a tight, leak-proof joint.

"Claim 10. An oil retaining means including a pliant diaphragm having an elongated contractile sleeve extending from one side, and a ductile ring secured to the peripheral portion of the diaphragm and adapted to be expressed into secure position on a contiguous support."

The findings suggested by the plaintiff are adopted.

Before the invention of Cantrell & Miller there was no known means to obtain an oil-tight seal inside the housing between it and the axle of an automobile, or in any similar situation. The problem was a serious one. The lack of such a seal permitted the escape of oil from the axle onto the brake drums and wheels and onto the garage floor and the road. This created a strong demand for means to stop such oil leakage, which demand continued unsatisfied and constituted a long-felt want for many years prior to Cantrell & Miller's invention. They were the first to solve this problem by producing an oil seal, that shown and described in the patent in suit, which went into wide and successful commercial use. It was a valuable contribution to the art.

In 1928 Cantrell & Miller went out of business after having netted over $500,000 from the invention. One cause for their retirement was the advent of the Model A Ford in 1928, in which the oil seals that Cantrell & Miller were making would not fit. Their seal was designed to fit the housing of the Model T Ford, the predecessor of the Model A. The Model A Ford was equipped with oil seals which embodied a ductile steel ring instead of a lead ring. These were made by the Chicago Rawhide Manufacturing Company, which later took a license permitting it to make these seals under the patent in suit.

The plaintiff bought the patent in 1931 and began the manufacture under it of similar steel-ring oil seals. Later, it granted licenses for substantial considerations to other manufacturers to make and sell such seals under the patent. Up to date, 50,000,000 of these steel-ring oil seals have been made and sold, of which the plaintiff and its licensees have made about 95 per cent. Automobiles use about 10,000,000 in a normal year. Every car made to-day has three or more such seals.

The marked commercial success of the Cantrell & Miller patent, together with the fact that plaintiff's rivals in business have paid substantial sums for licenses under this patent, is entitled to some weight. Benjamin Electric Mfg. Co. v. Northwestern Electric Equipment Co.. (C. C. A.) 251 F. 288; Wahl Clipper Corporation v. Andis Clipper Company (C. C. A.) 66 F.(2d) 162; Collins v. Hupp Motor Car Corporation (D. C.) 4 F.(2d) 272.

The defendant's seal is substantially identical with the seals made by the plaintiff and its licensees under the patent. They are shown in the chart plaintiff's Exhibit 46. There is no other kind of seal known press and hold its periphery in a secure oil-tight radially-pressed fit, and a contractile pliant leather sleeve to make an oil-tight fit on a moving shaft. They were also the first to secure to a pliant leather diaphragm,

EXAMPLES OF LICENSED OIL SEALS

CHICAGO-RAWHIDE MANUFACTURING CO.    MICHIGAN LEATHER PACKING COMPANY    GRATON & KNIGHT MANUFACTURING CO.    SUPER OIL SEAL CO.    UNIVERSAL OIL SEAL CO.

EXAMPLES OF PLAINTIFF'S OIL SEALS

EXAMPLES OF DEFENDANT'S OIL SEALS

to-day that could take the place of these seals made by the plaintiff, its licensees, and the defendant. It is the only kind of seal used to-day for its particular purpose.

Cantrell & Miller were the first to devise an oil seal to be used inside a housing which prevented the leakage of any oil between the housing and an inside rotating shaft. This was a new result. They were the first to combine an oil-tight seal on such shaft with an oil-tight peripheral seal against the inside of the housing. Its mode of operation was new. They were the first to devise the combination of a pliant leather diaphragm having a contractile sleeve, oil-tight on the shaft, secured to an outer ring composed of metal having functional ductility and resiliency. This was a new means.

Cantrell & Miller were the first to utilize in this combination the ductility of the metal to permit its periphery to be squeezed outward or "expressed" so as to fill the irregularities and out-of-roundnesses in the supporting housing to form therewith a secure oil-tight leak-proof joint. They were the first to utilize in this combination the resiliency of the metal of the ring to ex-

having a contractile sleeve pressed onto a rotating shaft, a ductile metal ring which, by its tight peripheral fit inside the housing, anchored the entire device against rotation.

The patent in suit shows the oil seal applied to the rear axle of the Model T Ford which was the automobile with which Cantrell & Miller were particularly concerned. The oil retainer or oil seal is a self-contained unit. It consists of a pliant diaphragm, formed of leather, composed of an elongated contractile sleeve 2, which is adapted to fit on the rotating axle, a conical portion 3, and a circumferential flange 4. The sleeve portion 2 is contracted by the springs 8. Secured to this pliant diaphragm is a ductile metal washer 9, so that there is an oil-tight seal between the ductile washer and the circumferential flange 4 of the pliant leather diaphragm. The patent suggests that the ductile ring "may be of lead."

To insert and secure this unitary device in the axle housing and on the axle, the roller bearing consisting of the rollers 15 and its sleeve is withdrawn from the end of the housing. An oil seal is pushed in until it seats against the shoulder 17 in the

housing. The tool B, used for pushing the oil seal into place, has on its inner face near its periphery an annular V-shaped ridge which is pressed against the side of the ductile washer. This pressure is applied by turning the nut 20 on the thread at the outer end of the axle which forces the tool B inward.

One effect of thus forcing this annular V-shaped ridge against the side of the ductile washer is to express or expand its periphery into position against the inside of the housing and fill up all the little irregularities and out-of-roundnesses that are in the housing bore at that point, so that a tight leak-proof joint is obtained. Another effect is to place that part of the metal of the ring, which is inside its peripheral portion, under resilient outward radial strain. This strain "expresses," i. e., forces radially outward, the peripheral portion of the washer. The mode of operation is that the ductile peripheral portion of the metal is expressed not only by the tool but also by the resiliency of the metal of the ring. The expression or outward expansion of the periphery of the ring to fill the little irregularities and out-of-roundnesses of the housing not only provides such an oil-tight radial fit, but also secured the seal against rotation.

Defendant's oil seal, like the millions of oil seals made under the patent in suit, consists of a pliant leather diaphragm which has an elongated contractile sleeve which embraces the rotating shaft and is pressed thereon by a suitable coil spring on the outside of the sleeve. The circumferential flange of this pliant leather diaphragm is secured in a soft steel ring composed of several parts. This soft steel ring is both ductile and resilient.

The defendant's seal therefore is composed of the same two essential parts as the seal specifically disclosed and described in the patent in suit, namely, a pliant leather diaphragm having a contractile spring-pressed sleeve, secured to a ductile resilient metal ring, "adapted to be expressed into secure position on a contiguous support" (claims 8, 9, and 10 in issue).

The outside of this ring is usually about two or three thousands of an inch greater in diameter than the inside of the housing. When the seal is driven into the housing, the soft steel ring is contracted just as a cork is contracted when it is driven into the neck of a bottle. As it is a physical fact that "action and reaction are equal and opposite," this contraction is resisted by the resiliency of the steel ring which constantly presses its periphery radially outward. The oil seal is pushed by a suitable tool into position within the housing, sometimes against a shoulder in the housing and sometimes not. In either case, when the seal is seated in its proper position in the housing, the resiliency of the steel "expresses" or expands outwardly the periphery of the ring. The ductility of the metal permits it to fill the irregularities and out-of-roundnesses in the inner face of the housing against which the ring is seated. This forms a secure leak-proof oil-tight joint between the periphery of the metal ring and the housing and prevents the seal from rotating.

The full equivalency of the defendant's steel ring seal and the lead ring used by Cantrell & Miller as the preferred embodiment of the patent in suit was established both by the testimony of plaintiff's practical experts and by the defendant's own tests.

The defendant's oil seal obtains the result of the patented oil seal. It has the same elements in the same combination and relationship. And those same elements cooperate by the same mode of operation to accomplish that same result.

The devices and patents of the prior art exploited by the defendant at the trial emphasize the radical novelty and the patentability of Cantrell & Miller's invention which is embodied in the defendant's oil seal.

Defendant's steel ring seal and plaintiff's lead ring are substantially equivalent as both may be regarded as soft metal. In the case of Rajah Auto Supply Co. v. Belvidere Screw & Machine Co., 275 F. 761, page 763 (C. C. A. 7th), the court said: "In using this term 'soft-metal' he [the patentee] was not referring solely to the metals sometimes or frequently classed as soft, but was referring to a particular bushing which possessed the qualities of a soft, yielding material, one that would upset under pressure and thereby accomplish certain results. Certainly, the expression, 'hard steel' is not unknown or unusual. It follows that, if there be a 'hard steel,' there must be a soft steel. 'Soft' and 'hard' are relative terms at best, and the matter of degree must often be determined by other language with which the words are used."

The Buda packing gasket is simply an asbestos ring partially covered with a copper sheathing. This ring was pressed into

the joint between the two flanges of an exhaust pipe of an automobile engine. It was in no sense an oil seal.

The British Triumph motorcycle and British patent No. 24,662 of 1913 are defendant's "best reference."

The device on which the defendant relies was the case-hardened and ground steel ring, marked C in the Triumph British patent. To this ring was fastened by rivets D the leather washer A, the end B of which bore on the crank shaft. This device was not oil-tight either between its periphery, and the housing or between the leather washer and the shaft.

The Triumph ring did not have anything like the amount of oversize necessary to make a leak-proof oil-tight nonrotative peripheral seal with its housing. The ring was so loose in the housing that it was necessary to provide a dowel pin, marked E in the patent, to prevent the ring from turning. Even if the fit were reasonably tight when the device was installed, the expansion of the' parts due to the heat of the engine expanded the aluminum housing faster than the ring and would open the joint between the housing and the ring and permit the free leakage of oil. Likewise vibrations and jars on the ring caused it to become loose.

The Triumph leather washer, marked A in the patent, would not prevent the oil on the crank shaft from leaking out along the shaft. This is because the "distorted" edge B of the washer is bent outwards from the crank case and therefore would permit leakage of oil out along the shaft.

The uselessness of this Triumph motorcycle seal as a means for retaining the oil has been completely demonstrated. The Triumph device did not embody a ductile metal ring. Its ring was case hardened. It therefore could not expand. Its periphery could not be "expressed" against the inside of the housing. The Triumph device lacked the construction and mode of operation and failed to attain the result of the oil seals of the lead ring and soft steel ring types here in controversy.

Fig. C of the New Departure Bulletin No. 40, on which the defendant relies, illustrates a felt packing ring set into a metal stamping which is fitted into the housing. It is referred to briefly as a "special composite member as outlined at C * * *. The closure member C is inclined as shown so the oil carried around by the axle will be deflected back to the bearing housing."

It was well known that a felt washer does not act as an oil seal, but on the contrary it acts as an oil wick which draws the oil by capillary attraction along the shaft through the felt to the outside of the packing. In fact, the Bulletin refers to this leakage in connection with a similar felt packing shown in Fig. F.

The oil slinger depicted in Fig. E of the Bulletin was the best means known prior to Cantrell & Miller's invention to deal with the problem of oil leakage. It was an evasion of the embarrassing consequences of the oil leakage and not a preventative.

There is no suggestion in the Bulletin that the metal ring of Fig. C was driven in with an oil-tight fit or that the oil did not leak past its periphery. The inefficiency of the felt device of Fig. C is further evidenced by the fact that none of these devices were ever made or put into practical use.

The New Departure Bulletin fails to disclose an oil seal of the sort here in controversy or to suggest in any way the Cantrell & Miller invention or the defendant's oil seal.

The Laycock patent, No. 1,169,271, shows two forms of oil retainer. One is described in the specification and the other is not.

The undescribed device, which is shown to the left of the shoulder 19 on the axle, consists of two annular felt washers held in place by a metal ring fitted into the housing. This device is obviously irrelevant.

The described device consists of the plate 22 to which is fastened by rivets "a" flange 24 of flexible material which cooperates with the wheel hub 25 to exclude dust and dirt from the bearing 21." This device is held axially in position against the end of the housing extension 11 by bolts 23. This device is not put into the inside of an axle housing and therefore has no peripheral fit. The absence of a peripheral fit of any sort removes it entirely from the category of the oil seals with which this case is concerned.

The Turner patent, No. 729,018, shows in Fig. 3 a leather cone K which is a flat S shape in cross-section. It is provided with a circumferential coil spring L which presses it against the piston rod B. The leather cone is compressed lengthwise by screwing up the unlettered cap on the screw threads at the top of the casing A. This

form of seal is wholly different from those of the patent in suit and of defendant.

The prior art shows that, before Cantrell & Miller, no one had devised or suggested a leak-proof oil-tight seal composed of a pliant leather diaphragm having a contractile sleeve, making an oil-tight joint on a moving shaft, secured to a ductile metal ring, which is adapted to be expressed by the resiliency of the metal into secure position on a contiguous support so as to form therewith an oil-tight leak-proof joint by the flow of the ductile metal of its periphery into the irregularities and out-of-roundnesses in its peripheral seat.

■ The reissue patent in suit, applied for November 10, 1920, within two years of the grant of the original patent No. 1,291,-397 on January 14, 1919, was a timely reissue and applied for with due diligence. The modern form of steel-ring seal did not come into use until some seven years later. There were no intervening rights. None of the claims in issue of the reissue patent are the same as, or of the same scope as, any claims which were contained in the original application and were rejected and canceled.

Claims 1 and 2 of the original application for the original patent, to which defendant refers, were not limited to an oil seal having a periphery adapted to make a leak-proof oil-tight seal by expansion or expression of its metal against the inside wall of a housing as are the claims in issue, but were broad enough to include the old bolted-on type seal.

The references cited by the Patent Office against these claims anticipated them either literally or in substance.

The first four claims of the patent in suit were the only claims in the original patent. As pointed out in the application for a reissue, these claims were unduly limited to specific details of the oil seal shown and described in the patent. They therefore did not adequately protect the invention and did "not properly and fully cover the invention disclosed." And it was true that the specification was "defective and insufficient to that extent," all as stated in the reissue oath of Cantrell & Miller. The failure to make claims adequate to protect the patentees' real invention therefore "arose from inadvertence and mistake" and constituted the "errors and omissions" in the original patent which rendered such patent "inoperative."

■ The fact that the reissue claims are broader than the claims in the original patent cannot affect the validity of the patent in suit.

In Keller v. Adams-Campbell Co., 264 U. S. 314, page 317, 44 S. Ct. 356, 357, 68 L. Ed. 705, the court stated: "That a reissued patent enlarging claims of the original, although not specifically mentioned in section 4916, R. S., is authorized by that section, when the failure to claim the larger claims justified by the actual invention was due to inadvertence, accident, or mistake, is settled by the decision of this court in Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658, and other cases."

In Topliff v. Topliff, 145 U. S. 156, page 170, 12 S. Ct. 825, 831, 36 L. Ed. 658, the court said:

"From this summary of the authorities it may be regarded as the settled rule of this court that the power to reissue may be exercised when the patent is inoperative by reason of the fact that the specification as originally drawn was defective or insufficient, or the claims were narrower than the actual invention of the patentee, provided the error has arisen from inadvertence or mistake, and the patentee is guilty of no fraud or deception; but that such reissues are subject to the following qualifications:

"First. That it shall be for the same invention as the original patent, as such invention appears from the specification and claims of such original.

"Second. That due diligence must be exercised in discovering the mistake in the original patent, and that, if it be sought for the purpose of enlarging the claim, the lapse of two years will ordinarily, though not always, be treated as evidence of an abandonment of the new matter to the public to the same extent that a failure by the inventor to apply for a patent within two years from the public use or sale of his invention is regarded by the statute as conclusive evidence of an abandonment of the patent to the public.

"Third. That this court will not review the decision of the commissioner upon the question of inadvertence, accident, or mistake, unless the matter is manifest from the record; but that the question whether the application was made within a reasonable time is, in most, if not in all, such cases, a question of law for the court.

"To hold that a patent can never be reissued for an enlarged claim would be not

only to override the obvious intent of the statute, but would operate in many cases with great hardship upon the patentee. The specification and claims of a patent, particularly if the invention be at all complicated, constitute one of the most difficult legal instruments to draw with accuracy; and, in view of the fact that valuable inventions are often placed in the hands of inexperienced persons to prepare such specifications and claims, it is no matter of surprise that the latter frequently fail to describe with requisite certainty the exact invention of the patentee, and err either in claiming that which the patentee had not in fact invented, or in omitting some element which was a valuable or essential part of his actual invention. Under such circumstances, it would be manifestly unjust to deny him the benefit of a reissue to secure to him his actual invention, provided it is evident that there has been a mistake and he has been guilty of no want of reasonable diligence in discovering it, and no third persons have in the mean time acquired the right to manufacture or sell what he had failed to claim. The object of the patent law is to secure to inventors a monopoly of what they have actually invented or discovered, and it ought not to be defeated by a too strict and technical adherence to the letter of the statute, or by the application of artificial rules of interpretation."

In Witzel v. Berman (C. C. A.) 212 F. 734, page 735, the court said: "No adverse rights were acquired by the public in the meantime and it seems to us that the action of the commissioner in granting a reissue with claims which cover only what Witzel invented is not open to criticism. It will be a disastrous blow to meritorious inventors if they cannot obtain the full fruits of their inventions because, through no fault of theirs, they fail to secure adequate claims, especially when they ask for the correction before the public has acquired any rights by reason of the mistake."

In Van Kannel Revolving Door Co. v. Winton Hotel Co., 276 F. 234, page 238 (C. C. A. 6th), the court said: "The substantial basis of the application for reissue was that the claims were not commensurate with the invention. If Van Kannel, through his solicitor, without intending to do so, drafted or accepted claims not commensurate with the invention, such act is an 'inadvertence' within the meaning of Rev. Stat. § 4916 (Comp. St. § 9461), which entitled him to a reissue."

Defendant's oil seal is an embodiment of Cantrell & Miller's invention and infringes their patent as to the claims 8, 9, and 10 in suit.

None of the devices of the prior art, taken separately or collectively, were or could be modified by the mechanical skill of that art, as it existed prior to Cantrell & Miller, to produce either the Cantrell & Miller seal or the defendant's seal, which is nothing but another form of their invention.

The reissue was entirely lawful and in accordance with the requirements of the reissue statutes.

The Cantrell & Miller reissue patent in suit is valid and has been infringed by the defendant's oil seals as to the claims in issue.

Plaintiff is entitled to the usual decree.

Settle findings and decree on notice.