## STANDARD MAILING MACHINES CO. v. DITTO, Inc.

No. 4331.

District Court, D. Massachusetts.

March 22, 1938.

George P. Dike and Cedric W. Porter (of Dike, Calver & Gray), both of Boston, Mass., for plaintiff.

Irving U. Townsend, Jr. (of Emery, Booth, Townsend, Miller & Weidner), of Boston, Mass., and Max W. Zabel and

Arthur W. Carlson (of Zabel, Carlson & Wells), both of Chicago, Ill., for defendant.

SWEENEY, District Judge.

This is a suit for damages resulting from alleged infringement by the defendant of two of the plaintiff's patents. They are reissue patent No. 19,951, dated April 28, 1936, based on patent No. 1,964,933, granted July 3, 1934, and patent No. 1,988,-056, filed July 25, 1931, and granted January 15, 1935. Both patents were applied for by one Storck, and by assignment to the plaintiff became its property. They pertain to a duplicating machine of the wet process type. The defendant sets up defenses of invalidity and noninfringement.

Statements of fact herein are intended as findings of fact, and statements of legal conclusions, as rulings of law, under the Equity Rules. Rule 70½, 28 U.S.C.A. following section 723.

The invalidity charged by the defendant is based upon lack of invention and anticipation by the prior art. As to the reissue patent, the following claims are in suit: 3, 8, 19, 20, 21, 22, 29, 30, 32, 34, and 40. As to the patent issued on January 15, 1935 (which shall hereinafter be referred to as the second patent) the claims in suit are claims 1, 2, and 3 of that patent.

In a wet process machine, such as the plaintiff's, the master copy is first made by placing a sheet of paper in a typewriter with the carbon paper in reverse so that the back of the sheet receives the carbon from the carbon paper, and the type is thus in reverse. After the master sheet is made, it is attached to the printing drum of the device with the reverse face outward; that is, the side of the sheet on which the print appears in reverse forms the face of the operative drum. Duplicating sheets, moistened to a slight degree, are then introduced into the machine so that they come in contact with the master sheet, obtaining an impression from the master sheet, which impression is the duplicate of the master sheet, except that it now appears printed in readable form instead of in reverse. The defendant's device operates in much the same manner.

Prior to the adoption of the plaintiff's device, there were three methods of obtaining duplicate copies from machines.

The first was a stencil machine, which required a great deal of skill, and did not produce a workmanlike result. Secondly, there was a gelatin machine which was limited in the number of copies it would make, and the results from this type of machine were not satisfactory. The third was the wet process method to which this suit is confined.

Prior to the first Storck patent the possibility of a wet process machine was well recognized, but efforts to reduce that possibility to a commercially acceptable fact had not proved successful. Perhaps the latest and best machine prior to the plaintiff's invention was the so-called Ormig (German) duplicating machine, for which a patent had been granted to one Ritzerfeld on October 18, 1927. The main stumbling block to a successful duplicating machine of the wet process type was the inability to properly dampen the sheet upon which the impression was to be made from the master sheet. What was needed was the application of moisture in a uniform and very slight degree. Ritzerfeld, for the first time, utilized a volatile liquid instead of water, and this change contributed much, but not enough. In the application and spreading of this liquid on the duplicate paper, he did not achieve much greater results than had previously been had with water. He provided for the application of the liquid to the duplicating sheet by passing that sheet through two rollers, one of which was a feed roll supplying moisture to the paper from a perforated tube within the roll. The fluid coming from the perforated tube through an absorbent roller moistened the sheet as it was being fed beneath that roll, and thus the sheet approached the master drum to receive the impressions of the master sheet. Ritzerfeld taught the idea of feeding the duplicating sheet through two rolls, one of which moistened the duplicating sheet prior to its contact with the master sheet. In actual use, the machine was not a great success, because of the lack of uniformity with which the liquid was fed to the duplicating paper, and also because the machine required constant attention and adjustment.

There was still left to be disclosed a successful method of applying the liquid uniformly and lightly to the duplicating paper so that it would not smear or be

blurred, and would make duplicates in greater quantities.

Although the plaintiff's original patent covered several variations in method of moistening, the claims relied on in the reissue patent deal solely with moisture applied to a roll through the medium of a wick in contact with the roll, the moisture being drawn by capillary action from a tank.

The claims in suit readily classify themselves as follows: 3 and 8 deal with the intermittent rotation of the platen and feed rollers; 19, 20, 21, 22, and 30 deal with the wick or fibrous material supplying moisture to the rotating roll, and thence to the duplicating copy; 29, 34, and 40 deal with the entire combination, including separate feed rollers, one of which acts as the moistening roller.

The mere introduction of paper through the feed rolls was not new, and the claim that the paper was positioned "by and between" the rolls, read in the light of the plaintiff's structure, means no more than introducing the copying paper into the bite of the feed rolls. This is accomplished while the feed rolls are stopped, and while the main drum holding the master sheet is still rotating. Such an accomplishment was brought about by the intermittent gearing of the master drum with the feed rolls. Intermittent gearing was old and well known in the art, and had been used in alarms in clocks for many years prior to the plaintiff's invention. The result of the stopping of the feed rolls while the master drum was still in rotation through intermittent gearing was therefore not invention. Without the intermittent gearing, the same result could have been obtained by merely stopping the operation of the master drum. Since this was a hand-operated machine, it required no effort or skill to accomplish such a step.

I therefore find and rule that claims 3 and 8 are invalid for want of invention. So much of the other claims as are based on the positioning of the duplicating paper by and between the feed rollers by reason of intermittent rotation of the platen and feed rollers would fall in the same category.

The other material and important element in the plaintiff's invention is the provision for the moistening of one of the feed rolls, through which the duplicating copy must pass, by means of a wick drawing a liquid to the roll by capillary attraction. Up to the time of Storck, no one had successfully solved the problem of applying moisture to the duplicating copy in the uniformly slight degree which would insure the success of the machine. It was well recognized in the art that the commercial success of wet process duplicating machines was dependent upon achieving such a result. In the Ormig-Ritzerfeld type of duplicating machine, moisture was provided from a wick to the paper by means of direct contact. His machine, however, did not meet with great commercial success as it was not productive of the desired results; namely, clear workmanlike copies without constant adjustment of the device. His lack of success was probably due to the fact that the wick spread the liquid unevenly on the paper as a result of the uneven contact with it, and did not diffuse the moisture lightly and uniformly. The use of the Ritzerfeld machine required constant adjustment of the parts. It did not meet with the approval of the trade.

After many experiments, Storck utilized an old and well-known theory, namely, a wick to draw liquid from a tank such as Ormig used, and the diffusion of the liquid through an intermediary roll. The mere addition of this step was all that was necessary to insure commercial success. He was the first to use the method of applying moisture to the duplicating copy by means of a wick supplying moisture to the feed roll which in turn distributed the received moisture evenly and uniformly on the duplicating copy. Up to that time moistening by immersion, by a porous feed roller, and by direct contact with an absorbent material, had all proved unsuccessful. The success of the wet process machine was dependent upon a method being supplied of distributing an extremely thin and uniform moisture to the paper. Storck supplied the method, and while he accomplished this by the addition of an old and well-known element, he, nevertheless, produced a new and acceptable result. In its combination it required more than the ordinary ability of one skilled in the art as attested by the failures of all prior attempts to build a commercially successful duplicating machine of a wet process type. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527.

Any doubt on this question is dispelled by the great success which was met by this machine in filling a long felt want. See Patent Royalties Corporation v. Land O'Lakes Creameries, 2 Cir., 89 F.2d 624.

Sales of the plaintiff's wet process duplicating machine in numbers of machines sold were as follows for the years indicated:

| | |
|---|---|
| Prior to 1931 | — None |
| 1931 | — 100 |
| 1932 | — 246 |
| 1933 | — 329 |
| 1934 | — 568 |
| 1935 | — 921 |
| 1936 | —1470. |

■ The need had existed. The elements of invention were old and well known, but the plaintiff had first achieved success which was immediate and universal. I therefore conclude and rule that the patent is valid in so far as claims 19, 20, 21, 22, 29, 30, 34, and 40 are concerned, in so far as they pertain either separately or in combination to the moistening provided solely by a wick and dampening roller as described in these claims.

■ In his reissue patent the plaintiff has narrowed his claims to provide for a method of moistening solely by a wick and dampening roller, and his invention must be construed to be no broader than the claims advanced by him. Claims 19 and 21 may be taken as illustrative. The file wrapper discloses that Storck had in mind the use of a wick and capillary attraction as commonly and generally understood. His present claim that the use of any fibrous material for the purpose of conveying liquid is a wick within the meaning of his claim is a different construction than that which he placed upon it at the time of his original application. In that application, he admitted that the words "means for transferring moisture from said reservoir to said roller" must mean a wick and capillary attraction, or his claim would be "squarely anticipated by the structure shown in the Thompson patent," and amended his claim so that he specified a wick. Since the reissue patent, by the plaintiff's own admission, is narrower than the original, I feel that he is limited in his construction to a wick as the word is commonly understood.

In the defendant's device, he does not use a wick or capillary attraction. He controls the flow of water from a tank elevated above the feed rolls by the use of a fibrous material which serves to retard the normal flow of water by gravity. This fibrous material, which extends from inside the tank through to the outside, comes in contact with another piece of fibrous material through which the moisture passes to the feed roll. This latter piece of fibrous material is not immersed in the liquid.

■ I am of the opinion that the plaintiff's patent should be limited to a very narrow construction, and to an equally narrow range of equivalents. Such a range of equivalents does not include an impeded flow of water by gravity. In the defendant's device, he does not use the wick in the commonly accepted sense of the term, although the fibrous material that he uses may be capable of being utilized as such. The defendant has perfected an old method of controlling the flow of water by impeding its downward progress. Such success as the defendant may have had in this method is not dependent upon the plaintiff's invention. Nor do I find that it infringes the narrow range of equivalents to which the plaintiff would be entitled. I therefore find and rule that the defendant does not infringe the plaintiff's patent.

■ There is no evidence from which I could find that the reissue patent is invalid because not properly based on error arising out of accident, inadvertence, or mistake under 35 U.S.C.A. § 64. The findings of the Patent Commissioner ought not to be disturbed on this question, except for error manifest on the record. See Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658. Nor do I find that there was fatal delay in making the application for reissue. I therefore find and rule that the patent No. 19,951 is valid, but not infringed.

■ The second patent (No. 1,988,056) is limited to feeding rolls in a copy multiplying device consisting of an absorbent pressure roller and a nonabsorbent, noncorrosive dampening roller. Claims 1, 2, and 3 are in suit. In this device the plaintiff has provided that the roller, other than the dampening roller, be constructed of an absorbent material for the purpose of absorbing moisture that might collect along the bite of the two rolls as well as moisture beyond the edges of the duplicat-

ing copy. This is but an application, through mechanical skill, of the well-known blotting principle, and does not constitute invention. See British Patent No. 57 (1870) and Dougherty No. 32,759 (1861). I therefore find and rule that the second patent, No. 1,988,056, is invalid for want of invention.

A decree may be prepared in accordance with the above.