**CARBIDE & CARBON CHEMICALS COR-PORATION v. U. S. INDUSTRIAL CHEMICALS, Inc.**

No. 249.

District Court, D. Maryland.

Sept. 19, 1940.

814

Watson, Bristol, Johnson & Leavenworth (by L. A. Watson, C. W. Fairbank, and Clair V. Johnson), all of New York City, and Hershey, Donaldson, Williams & Stanley (by Raymond S. Williams and Kenneth Ekin), all of Baltimore, Md., for plaintiff.

Pennie, Davis, Marvin & Edmonds (by Dean S. Edmonds, Frank E. Barrows, and Frederick L. Bissinger), all of New York City, and Venable, Baetjer & Howard (by Harry N. Baetjer), all of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a patent suit involving a process for the production of ethylene oxide, $C_2H_4O$, by direct chemical combination between ethylene, $C_2H_4$,—a hydro-carbon gas,—and oxygen. Ethylene oxide has various uses, notably when hydrolyzed with water, forming ethylene glycol which is one of the most effective anti-freeze preparations for use in automobiles, and which, therefore, has great commercial value. Soluble in water like alcohol, it is more effective and economical because it does not boil off, like alcohol.

The suit is based upon Reissue Patent No. 20,370, dated May 18th, 1937, which the plaintiff, the Carbide & Carbon Chemicals Corporation, acquired by assignment from one Theodore Emile Lefort, of Paris, France, to whom the original United States Patent No. 1,998,878, was issued on April 23rd, 1935, upon application dated March 22nd, 1932. This original patent was based upon a process developed by Lefort in France, and there patented March 27th, 1931.

The original United States patent, No. 1,998,878, embraced seven claims, and the reissued patent here in suit repeats these seven claims in substantially the same form, but also embraces two additional claims, Nos. 8 and 9, which two are the only ones here in suit, and are virtually identical except in two unimportant respects which will be hereinafter referred to. The specifications in the two patents are quite different in their form,—that is, as to the language employed. Whether any departure in the specifications of the reissued patent from those of the original patent is a material variance, will be considered later.

In both claims 8 and 9, the process set forth for the production of ethylene oxide embraces six steps. We quote claim 8 in full, and have inserted numerals indicating the language in the claim which covers these steps: "The process of making ethylene oxide by the direct chemical combination of oxygen with ethylene in the proportions of one atom of oxygen to one molecule of ethylene, which comprises (1) forming a mixture containing ethylene and molecular oxygen and (2) conducting said mixture through a confined reaction zone which is maintained at an elevated temperature; (3) controlling said temperature to maintain said mixture in said zone at a temperature between about 150° and about 400° C.; (4) subjecting said mixture in said zone at said elevated controlled temperature to intimate contact with an active surface catalyst of a material having the catalytic characteristics of silver which favors the direct oxidation of said ethylene in said mixture by said molecular oxygen to form oxidation products containing ethylene oxide in the presence of water, and which does not favor the existence in said products of substantial amounts of aldehydes; (5) correlating the passage of said mixture through said reaction zone in the presence of said catalyst and the controlled elevated temperature of said mixture and said catalyst to effect said oxidation of said ethylene directly to form substantial amounts of ethylene oxide; and (6) thereafter recovering ethylene oxide-containing product in liquid form."

Shorn of technical phraseology and summarized very briefly, the process may be described as consisting of the passage of a mixture of ethylene gas and air through a tube containing a silver catalyst heated to a controlled temperature between approximately 150° and 400°. The direct combination of the air with the ethylene produces ethylene oxide. A side reaction also occurs in that there is destructive oxidation of some of the ethylene, producing carbon dioxide and water. It is claimed in the introductory statements of the patent that "This process is characterized by an entirely unique reaction in which the direct addition of a single oxygen atom to the ethylene molecule occurs without the formation of significant amounts of other oxygenated compounds such as aldehydes." That is to say, the product is claimed to be a notably clean one,—pure ethylene oxide, in readily recoverable form.

The defenses asserted by the defendant, the United States Industrial Chemicals, Inc., are both invalidity of the plaintiff's patent and non-infringement. Defendant urges seven grounds in support of its claim of invalidity, as follows: (1) That claims 8 and 9 are vague and functional, and are expressed in terms of result instead of procedure whereby the result is attained; (2) that the specifications of the original Lefort patent were deficient, in that they did not describe the alleged invention in "full, clear, concise, and exact terms" as required by Section 4888 of the Revised Statutes, 35 U.S.C.A. § 33; (3) that the patent in suit lacks novelty, in that its specifications describe a method known prior to the effective date of the original French application in 1931; (4) that there has been no disclaimer filed by the plaintiff of claims Nos. 2, 4, 5 and 7, wherein there are claimed methods which are not described in the specifications, and also methods which are stated to be specifically disclaimed in the sworn statement filed by the plaintiff, in furtherance of its application for the reissued patent in suit; (5) that the specifications of the reissued patent in suit describe, and claims 8 and 9 thereof claim, an alleged invention different from that described and claimed in the original patent No. 1,998,878; (6) that the original patent No. 1,998,878 was not inoperative for the protection of the alleged invention therein described, and that, therefore, there was no statutory basis for the reissue of the patent; and lastly (7) that there was no inadvertence, accident or mistake in the application for or ground of the original patent No. 1,998,878, and that, therefore, there was no statutory basis for its reissue.

The defendant rests its defense of non-infringement upon two grounds: (1) the usual ground that the process followed by the defendant is materially different from the process described as the invention of the patentee in the original patent No. 1,998,878, and also in claims 8 and 9 of the reissued patent in suit, when properly interpreted in relation to the original patent; and (2) estoppel, which in turn is based upon two grounds: (a) that claims 8 and 9 of the patent in suit cannot be given an interpretation sufficiently broad to include defendant's process, because during the prosecution of the application for the original patent No. 1,998,878, in the Patent Office, broad claims were presented but rejected, and the applicant acquiesced in

this rejection, cancelled the claims, and in connection therewith, stated that he had made an invention of narrower scope involving use of a specific catalyst which was defined in the claims he retained and which the defendant has not used; also that in the application for the reissued patent in suit other broad claims were presented but were rejected; and that the present plaintiff, then owner of this application, acquiesced in the rejection and cancellation of such claims; and (b) that defendant has acquired intervening rights entitling it to continue to use its process, by reason of the fact that prior to the filing of the application for the reissued patent in suit and also prior to the granting thereof, the defendant had spent large sums of money in research, investigation, development and commercial use of its present process.

While, as above set forth, there are seven separate grounds alleged by the defendant in support of its charge that the reissued patent in suit is invalid, we will start with the third ground, since the conclusion which we reach, as we are now about to explain, with respect to this and the remaining four grounds, especially the fifth and sixth, namely, that they are untenable, renders untenable the first and second grounds also.

■ With respect to the third ground, namely, that there is lack of novelty in that the specifications describe a method known prior to the effective date of the original French application in 1931, defendant relies primarily, if not indeed exclusively, upon the contention that Lefort is anticipated by two patents to K. P. McElroy: No. 1,253,617 issued January 15th, 1918, upon application filed August 2nd, 1912, and No. 1,308,797 issued July 8th, 1919, upon application filed July 26th, 1917. Suffice it to say that the overwhelming weight of the credible evidence on this point is to the effect that these patents did not disclose the Lefort process and, in fact, that the processes purported to be disclosed by these patents have never been demonstrated to be operative or of any commercial value. While Professor Hugh S. Taylor, testifying for defendant, stated that in his opinion the McElroy patents did anticipate Lefort; and while the point has been stressed that these patents were not cited to the Patent Office in connection with the Lefort application, we are not convinced by Professor Taylor's statements. In fact, it is in evidence that in a treatise published by Professor Taylor in 1926, the statement appears that the reaction claimed by McElroy was impossible,—a contradiction of his testimony in the present case. The McElroy specifications are far broader than the patent in suit; indeed, are devoid of definition of the requisite temperatures, the silver content of the catalyst, etc. These patents, along with others of McElroy, were purchased by the plaintiff company in 1922 for a nominal sum and, as already stated, there is no proof that they have ever been of any practical or commercial value. No witness in the present suit has ever personally tested the sufficiency of the teachings of these patents in direct relation to the patent in suit.

■■ The fourth ground urged by defendant is a failure to disclaim, that is to say, that there was no disclaimer filed by plaintiff of claims 2 and 4, 5 and 7, wherein there are claimed methods which are not described in the specifications, and also methods which are stated to be specifically disclaimed in the sworn statement filed by the plaintiff, in furtherance of its application for the reissued patent in suit.

It is to be noted that this fourth ground relates to claims which are not at issue in the present suit, and which are of a much narrower scope. Suffice it to say that there is no merit in this point, since a patent will not be invalidated for mere failure on the part of the patentee to disclaim prior to some judicial decision upon the subject matter, i. e., upon one or more of the claims, of the patent. After that, the patentee must act with diligence in accordance with the result of the adjudication. Ensten v. Simon, Ascher & Co., 282 U.S. 445, 455, 51 S.Ct. 207, 75 L.Ed. 453; Maytag Co. v. Hurley Mach. Co., 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264.

■ With respect to the fifth ground, namely that there is a variance between the invention described in the specifications and claims of the original patent and in the specifications and claims 8 and 9 of the reissued patent in suit, the two main points upon which this argument rests are (1) whether the addition of water in the reaction zone is mandatory in either or both of the patents; and (2) whether the specifications in the respective patents are materially at variance as to the type of catalyst to be used.

Our conclusion is that there is no material variance on either of these points. As

to water, the contention of the defendant, as set forth in the testimony of its various experts, is to the effect that the addition of water is mandatory under the requirements of the first patent, but not under the reissued patent here in suit. This argument is a highly technical one and is devoid of any support except such as is to 'be found in a highly refined interpretation of the antecedent French patents obtained by Lefort, and of certain language employed in the specifications of the United States patents; and also by isolating, erroneously as we think, this language rather than treating it in a practical' manner in the light of the language of the respective specifications and claims read and applied as a whole.

Defendant emphasizes the fact that water is not mentioned in the first or introductory paragraph of the reissued patent in its statement of what the process for the production of ethylene oxide consists, whereas, it is referred to in the corresponding paragraph of the original patent; that is to say, the process is there stated to consist mainly of "subjecting ethylene to the simultaneous action of the oxygen, or air and of water, in presence of a catalyzer, and, if need be, of hydrogen." However, with respect to water, the specifications of the original patent are not essentially different from those in the reissued patent.

·We find in the original patent that "Water can be admitted in the reaction vessel, either in the liquid state, or as steam. * * * The efficiency of the reaction is increased by diminishing the $CO_2$ which is formed, by introduction, in this reaction, of a suitable quantity of water. * * * From experiments effected by the applicant, it results that, if water is introduced in suitable quantity, the reaction is not only facilitated as above stated, but, in addition, the reaction giving $CO_2$ * * * is checked, owing, as is probable, to the partial pressure of water. * * * The experiments effected by the applicant have shown that, in presence of the catalyzers indicated, water, in the form of steam or not, considerably promotes the reaction insuring the production of ethylene oxide." Then we find in every one of the seven claims of the original patent specific recognition of the existence of water or steam in the reaction zone.

Turning to the reissued patent, the language is not materially different. For example, it is stated in the specifications that the oxidation of ethylene "can be facilitated by suitable dilution of the reaction gases, such as that accomplished by the use of air as the source of oxygen, and some water or carbon dioxides in addition to that formed can be admitted to the mixture in the reaction zone if desired. Hydrogen may be similarly added. * * * In any case, the ethylene and oxygen are thus reacted simultaneously at the temperatures set forth in the presence of surface catalyst and of water, * * *." In the added claims in the reissued patent, that is to say, claims 8 and 9, here in suit, the desired reaction is described as taking place "in the presence of water."

On this point it is the weight of the credible evidence as to what actually has been and can be done under the patents that, in the last analysis, should control, and Professor Arthur B. Lamb, testifying on behalf of the plaintiff, has satisfied the court, through his very clear exposition of the character and results of his laboratory tests, that one skilled in the art, following the teachings of the original patent, will be successful in producing what that patent calls for, and in obtaining such result whether the addition of water be considered as mandatory or as optional, and that he will obtain the same result if he follows the teachings of the reissued patent in suit. In other words, what Professor Lamb accomplished by following the original patent proves not only the adequacy of its disclosure as to how to carry out the process successfully, but in addition, conclusively demonstrates that there is no variance between the subject matter of the original and the reissued patent. It is particularly significant that Professor Lamb never saw the reissued or the third French patent (hereinafter referred to) until after he had testified in the present case. He stated that it never occurred to him that the specifications of the original patent required the addition of water, but that it was advisable to make the addition, in view of the aggregate that was said to facilitate the reaction and, therefore, he did not dry the air. In other words, he decided to use the air either as it came, or with the slight additional amount of moisture that it might pick up from going through the wash bottle.

`Summarizing his conclusions, Professor Lamb stated that although he had not previously read the reissued patent, it necessarily followed from the results of his experiments

under the original patent that, even if he had studied the reissued patent and even if it be assumed that water was specifically omitted as a requirement therefrom, this would not, from the technical chemical point of view, be a material departure.

Defendant has injected into the case a very large amount of testimony with respect to French patents issued to the assignee of Lefort, namely, the Societé Anonyme; Societé Francaise de Catalyse Generalisée, of Paris, as well as certain British patents issued to the same patentee, in an attempt to prove that the process originally conceived by Lefort, in 1931, and patented in France and Great Britain, required the use of water added in more or less large amounts, and that it was not until after the French patentee had applied for a third patent in France in 1933, from which, as it is alleged, the mandatory requirement of his other patents that water be introduced into the reaction chamber was omitted, thereby reducing production costs and explosion hazards, that the plaintiff applied for the reissued patent in suit. In other words, defendant claims that the original United States patent has been reissued as a patent for an invention which had not been made at the time the application for the original was filed; that the reissue is a patent for a different process described in the third French patent and the third British patent, and although based upon a 1931 filing date, is a patent for a 1933 invention.

In support of this contention defendant has gone to great length to analyze the language of the first two French patents, No. 729,952 and No. 739,562, with their various additions, the first of which is stated to be a patent for a process for producing ethylene glycol, and the second for a process for producing ethylene oxide; and also the two corresponding British patents, Nos. 402,438 and 402,749. Reliance is also had upon the assertions of the patentee in the third French patent, No. 771,650, and the third British patent, No. 431,966, to the effect that the invention protected by those patents was, in fact, a new discovery constituting an improvement over the prior patents and embracing certain definite advantages.

But the reissued patent in suit can only be invalidated by evidence far more convincing than what the defendant has produced on this score. Indeed, a critical analysis of the various French patents with their additions, and of the various British patents, is not necessary since they can conclude nothing for our purposes, in view of the testimony already analyzed and which stands, as we think, totally without any successful refutation, given on behalf of the plaintiff by Professor Lamb, and confirmed by Professors Frazer and Stevenson, to the effect that by virtue of their own personal tests made in the light of their knowledge of this branch of chemistry, there is no material difference in the teachings of the original United States patent and the reissued patent in suit with respect to the need for the addition of water in the reaction zone; and that it is only through placing an emphasis, unwarranted by both specifications and claims, upon the reference to water as an ingredient of the process, that any distinction is to be found between the requirements of the respective patents. Indeed, while it is very difficult to reconcile a good deal of the language employed in the various French and British patents,—some of the experts who testified being themselves unable to explain away certain apparent contradictions in the various representations made with respect to the successive claims,—we may assume that under French or British law it may have been appropriate to accord, as was done, the dignity of a patent to the various alleged distinctions and still we are not required to give any conclusive effect to the same in this proceeding.

Finally, whatever weight might otherwise be attached to these foreign patents and the various representations made in connection therewith, is negatived not merely by the contrary findings based upon practical as opposed to merely theoretical considerations, as above explained, but by the fact that the conclusion that the defendant would have us draw from this line of argument, namely, that the application for the reissued patent in suit was inspired by and had no other basis than the third French and British patents, is completely refuted by the unimpeached testimony of plaintiff's patent attorney to the effect that, in his search of the Patent Office records, he found no evidence that applications had ever been made there for patents based upon the third French or British patents, and also, that he had no knowledge of these patents when he had charge of the application for the reissued patent in its progress through the Patent Office. This supports Professor Lamb's conclusion,—which

necessarily follows from the rest of his testimony,—that the third French and British patents represented no actual improvement in the process, by dispensing with the introduction of water vapor into the reaction zone, and thus minimizing, or obviating entirely, explosion hazards by avoiding the necessity of vaporizing large amounts of water.

The court requested that tests be made in advance of the trial in the presence of representatives of both sides,—confirmed by its insistence upon the appointment of Professor Frazer as a neutral inter-partes expert witness, so that precisely such questions as this one, relating to the use of water, might be thoroughly thrashed out in advance of the trial. Yet, after eight days of trial, the defendant produced no witness that had made, or had co-operated with Professor Frazer in making, any inter-partes tests following the teachings of either the original or the reissued patent. So it seems to the court that the testimony, clear and convincing, of Professors Lamb and Stevenson, and the testimony to the same effect by Dr. Curme, Director of Research for the plaintiff company, supported fully as it is by the inter-partes tests made by the neutral expert, Professor Frazer, must control.

So much for the question of the requirement as to water in the respective patents. Turning to the second question, namely, whether there is, nevertheless, a variance in the two patents with respect to the catalytic specifications, we have no hesitancy in concluding, from the weight of the credible evidence, that this question likewise must be answered in the negative.

The gist of defendant's contention is that the specifications and claims are too broad and indefinite with respect to what catalyst shall be used. In other words, the defendant would have us believe that what is specified is merely the use of a silver catalyst that will work, with admonition against using one that will not work,—namely, that the specifications and claims are expressed in terms of the desired result, rather than in terms descriptive of the catalyst itself that will produce such result.

We find this argument totally lacking in merit and, again, the best evidence that this is true is to be found in the testimony of Professor Lamb. Without any knowledge whatsoever of the French patents or of the reissued patent in suit, he followed the teachings of the original patent. He testified that he wanted to avoid trying a number of catalysts and he reasoned that the most efficacious one, and the simplest to prepare, would be one consisting solely of silver because silver was so frequently mentioned in the specifications. He, therefore, used granules of silver oxide, being a compound of silver that would decompose at temperatures within the range specified. He used no carrier, lest he might select one that would be active in decomposing ethylene oxide, and he did not want to assume this handicap. In his first experiment, the conversion of ethylene to ethylene oxide was as high as 28.7%, and in his last experiment (some eleven were made in all), the conversion percentage was as high as 37.7%. His average for all the tests was approximately 33% which, as well as the lowest percentage that he obtained, concededly represents good conversion for commercial purposes. Professor Frazer also used a silver oxide catalyst, but sustained it in filtros. He also used no additional water,—only the water-vapor that entered with the gas mixture, and emphasized his belief that the amount of water was not important. His conversion percentages were somewhat less than Professor Lamb's.

In view of what Professor Lamb was able to do according to the teachings of the original patent, it is idle to contend that the same could not be done by following the teachings of the reissued patent because there is no real variance between the two. In the original patent, twelve different catalysts are set forth, whereas, in the reissued patent there is no such enumeration, the specifications merely prescribing the use of "such a surface catalyst as one composed of silver in finely divided form, and which may be disposed within the tube on a supporting material, or in other known ways." However, in the original patent in two out of the three modi operandi given as illustrations, as well as in each of the seven claims of that patent, silver, or a mixture containing silver in some form, is specifically referred to. So, this ties up precisely with the specifications of the reissued patent to the effect that a catalyst should be used "composed of silver in finely divided form, and which may be disposed within the tube on a supporting material, or in other known ways"; also, with the further statement in the reissued patent specifications that "The surface catalyst is preferably silver as stated, but other metals

such as bismuth and antimony may be used", and with the fact that each of the first seven claims of the reissued patent (whose language is virtually identical, except for slight transpositions of phrases, with that of the seven claims of the original patent) call for a catalyst composed of silver, or a mixture containing silver.

Defendant stresses the case of Russell v. Dodge, 93 U.S. 460, 23 L.Ed. 973. We find nothing, after a careful examination of this case, in conflict with our decision, because in that case there was obviously not merely a clarification but a change from one invention to a different one.

■ In deciding as we do, we are not unmindful of the fact that Professor Frazer queried whether the clause in claim 8 (broader than the corresponding one in claim 9) calling for "material having the catalytic characteristics of silver" might be too broad,—i. e. might include all future discoveries in this catalytic field,— conceivably catalysts having no silver content whatsoever. However, we do not entertain any doubt as to the validity of the claim on this score, because it must be read in the light of the specifications which, in turn, in their broadest aspect, are to be interpreted as embracing besides silver, only such other metals as are actually enumerated or were actually known, at the time of the original application.

There is one other difference to be noted between claims 8 and 9, i. e., that the latter does, but the former does not, expressly provide for the use of "a heat-absorbing diluent." But this difference is not of material significance, since the use of such a diluent is provided for, optionally in the specifications of both patents, and in both, the same diluents are specified, namely, oxygen, hydrogen, or carbon dioxide.

Defendant claims that Professor Lamb's testimony should be given no credence because it is opposed to the oral testimony of representatives of the Dutch Shell Company, which had had an option to acquire the United States rights in the French patents and in the pending United States application, but which it declined to exercise, because its laboratory tests produced unsatisfactory results; and to certain correspondence introduced in connection with the testimony of these same witnesses, out of which certain parts are taken and stressed as indicating not merely an admission on the part of the French Company, the owner of the pending United States ap-

plication, that it was deficient in its disclosure, but that there was a wilful withholding of necessary specifications. Also, we are asked to reject Professor Lamb's testimony on the ground that his experiments were ex parte.

We are not impressed with any part of this position taken by the defendant. In the first place, defendant can ill afford to attack the experiments and results obtained by Dr. Lamb, or by the other experts for the plaintiff, as being ex parte, since they are not only fully corroborated by tests made by Professor Frazer, pursuant to court order, in the presence of defendant's representatives, but since defendant has wholly failed to present to the court any experiments whatsoever, conducted by any of its own witnesses pursuant to the requirements imposed in connection with the appointment of Dr. Frazer.

As for the testimony in connection with the Dutch Shell Company's efforts, suffice it to say that we find nothing improper in the correspondence of the French Company above referred to, when considered as a whole, in the light of the business transactions that were involved. Indeed, this correspondence, when so considered, confirms the bona fides of plaintiff's contention that there was real need for clarification of the original United States patent, and that this was the sole basis for the application for the reissued patent and additional claims, and for the changes in the specifications in that application over the original application, and for the variations in the additional claims over the claims of the original patent.

Finally, the testimony of the Dutch Shell representatives loses weight because of the admission of one of that company's officials that he was not a disinterested witness in the present litigation, in that, if the patent in suit should be held invalid, his company contemplated entering into the manufacture of ethylene oxide.

■ Turning to the sixth ground, which is that the original patent was not inoperative for the protection of the alleged invention and that, therefore, there was no statutory basis for the reissue of the patent, this ground is so intimately related to the seventh ground that the two might well be considered as one.

We do not understand that it is necessary, in order to warrant a reissue of a

---

patent, that the original patent be inoperative in the literal sense. The power to reissue a patent may be exercised when the original patent is inoperative in the sense that its specifications are defective or insufficient, or when the claims are narrower than the actual invention of the patentee, provided the error has arisen through inadvertence or mistake, and the patentee is guilty of no fraud or deception; and provided, of course, that the reissue shall be for the same invention as the original patent, as disclosed by the specifications and claims of the original, and that due diligence is exercised in discovering the mistake in the original patent. 35 U.S.C.A. § 64. A delay of two years is too long, in the absence of very special circumstances. Wollensak v. Reiher, 115 U.S. 96, 5 S.Ct. 1137, 29 L.Ed. 350; Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658; Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463, 466, 44 S.Ct. 342, 68 L.Ed. 792. We find that the plaintiff has met these requirements. It is to be noted that the application for reissue was filed within a year and a half after the original patent was issued.

On the seventh ground, namely, that there was no inadvertence, accident or mistake in the application for or ground of the original patent and that, therefore, there was no statutory basis for its reissue, we conclude that the affidavit by the French attorney,—who was not himself a chemist and who sets forth why, acting merely as attorney in Paris and transmitting the papers to the attorney in Washington, he unduly restricted the original application,—adequately disposes of this seventh ground, and we do not consider it is necessary to discuss further the contents of this affidavit. Topliff v. Topliff, supra. The bona fides of the application is further confirmed by the testimony of the attorney for the plaintiff company to the effect that in 1936, after the company's chemists had accomplished satisfactory results in their experiments with the Lefort process, and the company had begun to negotiate for the purchase of the original patent, he examined further into its claims in the light of the original French patents, but without any knowledge of the third French patent, and concluded that the original United States patent was basic; that its claims were too narrow and that, thereupon, he began the preparation of the application for the reissue.

Coming now to the question of infringement, and taking up the first ground of defendant's defense of non-infringement, namely, that the process followed by it is materially different from the process described as the invention of the patentee in the original patent, and also in claims 8 and 9 of the reissued patent when properly interpreted in relation to the original patent, we find no merit in this contention. Plaintiff has graphically set forth in printed exhibits (plaintiff's exhibits Nos. 8 and 9) in parallel lines what is required, step by step, under the two claims in issue of the reissued patent, and what is actually admitted as done under defendant's process. Because of the unquestioned similarity, step by step, of the two processes, and because of the almost complete identity of claims 8 and 9, it seems sufficient if we incorporate in this opinion by reference, without copying, the aforementioned comparative analysis of these claims and defendant's process. Again, the court is unfortunately without the benefit of the results that would have been disclosed had tests been made, as it was understood they would be, on behalf of the defendant, in the presence of plaintiff's representatives, of the process in accordance with the reissued patent and with the process commercially followed by the defendant in its own plant. However, were the results of such tests available, it is obvious that they would not fail to be corroborative of the conclusion here reached that the processes are virtually identical, and that, therefore, defendant is guilty of infringement. Indeed, in the course of the trial defendant's counsel has admitted that if the presence of water in the reaction zone is found to be optional in either claim 8 or 9, then defendant infringes.

We come then, finally, to the second ground of the defense of non-infringement which, as we have seen, is twofold: (a) that claims 8 and 9 of the reissued patent cannot be given an interpretation sufficiently broad to include defendant's process because, during the prosecution of the application for the original patent, broad claims were presented but rejected and the applicant acquiesced in this rejection, cancelled the claims and in connection therewith, stated that he had made an invention of narrower scope, involving the use of a specific catalyst which was defined in the claims he retained; also, that in the application for the reissued patent, other

broad claims were presented but were rejected; and that the plaintiff, then owner of this application, acquiesced in the rejection and cancellation of such claims; and (b) that defendant has acquired intervening rights entitling it to continue to use its process, by reason of the fact that, prior to the filing of the application for the reissued patent in suit and to the granting thereof, the defendant had, by research, investigation and development, devised and used its present process, involving large expense.

Taking these grounds up in the order stated, the first one may be dismissed forthwith, because it is the same as the fourth contention raised by defendant in its attack upon the validity of the reissued patent, which we have already fully discussed and found to be without merit.

As to the second ground, namely, that of intervening rights, it is difficult to understand how this contention can be seriously made. The principle invoked is well established, namely, that a patentee having consciously accepted with satisfaction a patent of given scope, may not remain idly by and allow his competitor to build up a business outside the scope of the patentee's claims and thereafter, with a desire to capitalize and take from his competitor what the latter has innocently created or developed, secure a reissuance of the patent so as to embrace the domain of his competitor. See Sontag · Chain Stores Co. v. National Nut Co.; 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204. But it appears that defendant never began to construct its present costly plant until after the reissued patent had been granted; and never began to operate it commercially for the production of ethylene oxide until more than two years later. It is a correct inference from the testimony that prior to the application for the reissued patent, defendant's work on this process amounted to relatively little, but that thereafter, defendant zealously progressed its development of plant and process, with a view to capitalizing what plaintiff had done. It has been testified on behalf of the defendant that more than $1,000,000 has been invested in its plant in Baltimore. But this was done by the company's officials with their eyes open to possible results. If they were too hasty or ill advised with respect to possible conflict between their rights or interests and those of the plaintiff, this is not something that a court of equity can relieve against. Indeed, it is precisely the sort of thing which a court of equity should condemn, not condone.

Defendant's counsel has attempted to make something of the point that the original Lefort patent was not used for five years, and that it is, therefore, to be treated as, in effect, a paper patent. But when it issued in 1935, there was competitive bidding for it until plaintiff acquired it in 1936, and the transition of the invention from laboratory demonstration to commercial installation was very rapid. Before the close of the following year plaintiff had erected and was operating a large plant at South Charleston, West Virginia, which now has a yearly output of more than ten million pounds. The French company had licensed the process in England, Belgium, Italy and Russia, and it had also been sought by German interests. In short, the value of the patented process had been recognized commercially in the important European industrial countries.

Defendant stressed the fact that up to the time the application for the reissued patent was filed, namely, September 25th, 1936, its research work had been steadily progressing for some two years, at a cost of over $100,000, and that this work was continued during the period that the application was pending, resulting in additional cost to the defendant of more than $50,000; also, that during this period, defendant had acquired its United States patent No. 2,125,333 for a catalyst, and had proceeded to develop a plant in which this invention was to be practiced. Defendant relies upon Sontag Chain Stores Co. v. National Nut Co., supra, and Otis Elevator Co. v. Atlantic Elevator Co., 47 F.2d 545, a decision of the Circuit Court of Appeals, 2d Cir. Defendant insists that its operations should be considered as entitled to protection up to the date of the application for the reissue, even if not to the date of its granting, and even though all such operations were entirely in the experimental and development stage, as distinguished from commercial operations. The cases relied upon do not so decide, nor do any to which we have been referred. In the Sontag case, the facts are quite different from those here presented. There, the court assumed, without deciding, the correctness of the lower court's conclusion that the enlarged reissue claims were valid.

and infringed. Also, the reissue was applied for within two years after the granting of the original patent. But here the analogy to the facts in the present case ceases, because in the Sontag case, the infringer actually began to use the accused machine within a year after the original patent was granted, and his manufacturer had begun to make and sell like machines two or three months thereafter; whereas in the present case, as already pointed out, the defendant not only did not enter upon the commercial production of ethylene oxide until more than two years after plaintiff had obtained its reissued patent, but never started the construction of its plant until after the reissue had been granted. With respect to the Otis Elevator case, the reissue there was not applied for until more than seven and one-half years after the original patent had been obtained, three of which were excused on account of the intervention of war, but the additional delay was not. The intermediate advance in the particular art there involved, i. e., that relating to stopping devices for electric elevators, was also an important factor. So, this case, likewise, is entirely different upon its facts from the case at bar.

For the aforegoing reasons a decree will be signed holding claims 8 and 9 of the patent in suit both valid and infringed.