## UNITED STATES INDUSTRIAL CHEMICALS, Inc., v. CARBIDE & CARBON CHEMICALS CORPORATION.
### No. 4774.

Circuit Court of Appeals, Fourth Circuit.

June 27, 1941.

Dean S. Edmonds, of New York City (Venable, Baetjer & Howard, of Baltimore, Md., and Frank E. Barrows, Charles W. Riley, and Frederick L. Bissinger, all of New York City, on the brief), for appellant.

Leonard A. Watson, of New York City (Hershey, Donaldson, Williams & Stanley, of Baltimore, Md., and C. V. Johnson and C. W. Fairbank, both of New York City, on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Carbide and Carbon Chemicals Corporation (hereinafter called plaintiff) brought a civil action in the United States District Court for the District of Maryland against U. S. Industrial Chemicals, Incorporated (hereinafter called defendant), for the alleged infringement of a patent. Judge Coleman, in the District Court, found the material issues in favor of plaintiff and directed that plaintiff recover from defendant profits, gains, advantages and damages, with a reference to a master to ascertain and report to the Court an account of these profits, gains and advantages and to assess the proper damages. Defendant duly took this appeal.

The United States Patent Office granted to Theodore E. Lefort patent #1,998,878 (hereinafter called the original patent), dated April 23, 1935, covering a process for the production of ethylene oxide. Plaintiff was the assignee of the patent. Later, a reissue patent (hereinafter called the re-

issue patent), Re.#20,370, dated May 18, 1937, was obtained from the United States Patent Office. Plaintiff's claims of infringement relate to the reissue patent and more specifically to Claims #8 and #9 of this patent.

Accordingly, though there are other issues involved in this case, there are two very vital questions that must be considered. The first question involves the validity of the reissue patent, particularly Claims #8 and #9. The second question, if such validity be sustained, is concerned with the infringement by the defendant.

### The Validity of the Reissue Patent

The point most seriously advanced by defendant, both in the briefs and in oral argument, is the invalidity of the reissue patent, particularly Claims #8 and #9, on the ground that the process disclosed in the reissue patent involves a substantial and material (even an essential) variance from the process set out in the original patent. More precisely, defendant claims that, in the process for the production of ethylene oxide under the original patent, the voluntary addition of water into the reaction-chamber is not only mandatory but is an essential step in this process; while under the reissue patent, the process calls for no voluntary introduction of water into the reaction-chamber. It is absolutely clear that, with or without this voluntary introduction of water, some water is, and must be, there formed through a side-reaction in the process.

■■■ The law is clear, under the reissue statute, Rev.St. § 4916, U.S.C.A., Title 35, § 64, that there can be no reissue patent for a new invention. Indeed, the cases go much further than this to hold that the reissue patent is invalid if, between the inventions disclosed first in the original patent and then in the reissue patent, there be variances that are essential, substantial and material. A leading case is Parker & Whipple Co. v. Yale Clock Co., 123 U.S. 87, 8 S.Ct. 38, 31 L.Ed. 100. Other important cases are Seymour v. Osborne, 11 Wall. 516, 20 L.Ed. 33; Giant Powder Co. v. California Powder Works, 98 U.S. 126, 25 L.Ed. 77; Mahn v. Harwood, 112 U.S. 354, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665. And the United State Supreme Court has cited and applied the Parker & Whipple Co. case, supra, in Matthews v. Iron-Clad Mfg. Co., 124 U.S. 347, 351, 8 S.Ct. 639, 31 L.Ed. 477; Yale Lock Co. v. James, 125 U.S. 447, 464, 8 S.Ct. 967, 31 L.Ed. 807; Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U.S. 38, 42, 43, 14 S.Ct. 28, 37 L.Ed. 989. And see, decided by this Court, the cases of Marvel Buckle Co. v. Alma Mfg. Co., 4 Cir., 196 F. 1006; A. D. Howe Machine Co. v. Coffield Co., 4 Cir., 197 F. 541. Yet a reissue patent is not invalid merely because the reissue patent contains claims broader than the original, Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658; or claims narrower than the original, Miller v. Bridgeport Brass Co., 104 U.S. 350, 26 L.Ed. 783.

■ In the instant case, the original patent (all italics are ours) thus begins: "This invention has for object a process for the production of ethylene oxide which mainly consists in subjecting ethylene to the simultaneous action of the oxygen of air and of *water* in presence of a catalyzer and, if need be, of hydrogen." Later, the patent (page 1, column 2, lines 10-11) states: "*Water* can be *admitted* (not formed or developed) in the reaction vessel, either in the liquid state, or as steam." Also we find (page 1, column 2, lines 15-16) "*introduction*, (again a word of conscious action) in this reaction, of a suitable quantity of *water*." Again (page 1, column 2, lines 36-43) is: "if *water* is *introduced* in suitable quantity, the reaction is not only facilitated, as above stated, but, in addition, the reaction giving $CO_2$ (carbon dioxide) * * * is checked." (Words in parentheses are interpolated).

Three modi operandi are set out in the original patent. In the first, there is (page 2, column 1, line 18) "a circulating pump allowing to *introduce water*", and (page 2, column 1, lines 20, 21) "The reaction will take place in this tube between ethylene, the oxygen of air, and water." In the second (page 2, column 1, lines 33–35), is "a mixture of ethylene, air, *water* vapour, and hydrogen is *caused to pass* therethrough (through the tube)." And, in the third (page 2, column 1, lines 41-44), is: "A silver colloid is introduced in a high pressure tube which *has been filled* with *water*. Pure ethylene under pressure is *then* added in order that it can dissolve in the water"; and (page 2, column 2, lines 3-5): "*Water*, in the form of steam or not, *considerably promotes the reaction ensuring* the production of ethylene oxide."

Not so strong (as to the voluntary introduction of water into the reaction chamber) is the language in the original patent of the

seven claims. The first three claims *each* begin (page 2, column 2): "A process for the production of ethylene oxide, consisting in subjecting ethylene to the simultaneous action of oxygen and *water*." In claims 3 and 4 (page 2, column 2) the language is identical, save that the word "steam" (a form of water) is substituted for the word "water". While in claims 6 and 7 (page 2, column 2) after the word "oxygen", we find the words "steam and hydrogen".

Apart from this verbal analysis of the original patent, we have made a careful study of the record. We are convinced that this original patent contemplated the voluntary introduction of water into the reaction-chamber not as an optional procedure, but as a step that would always be taken. The verbal analysis shows that, in the original patent, literally there is "Water, water, everywhere". Nor is it water developed as a by product, but it is water voluntarily introduced into the tube to bring about the desired reaction. There is some expert testimony in the record which might seem to prove the contrary. This testimony, *as to the specific point now before us,* is considerably weakened by two considerations. These experts were super-chemists of unusual distinction; they were not the patentee Lefort. They drew not only upon their vast store of technical knowledge, but they used, too, what developments (and these were far from inconsiderable) had been made in the whole field of the Lefort patent since application for this patent was made by the inventor. Some study of chemical history and literature, as these existed at the time of Lefort's labors, convinces us even more strongly of the truth of the conclusion that the voluntary introduction of water was a mandatory provision of the original Lefort patent.

It seems quite clear, on the other hand, that the reissue patent does *not* contemplate the voluntary introduction of water into the reaction-chamber as a necessary step in the procedure. There is no mention of the word "water" in the introductory paragraphs of the reissue patent (apart from an incidental statement on page 1, column 1, line 23, that oxidation of ethylene gives some carbon dioxide and water). Indeed, the word "water" is not found until the 39th line of page 1, column 1, and note how different is the language here used, when compared with the language of the original patent. Here we find (page 1, column 1, lines 39-42): "*Some water* or carbon dioxide in addition to that formed *can* be admitted to the mixture in the reaction zone if desired." And the word "water" occurs only once more in the reissue patent before the claims are set out. We find (page 1, column 2, lines 12-16): "Ethylene and oxygen are thus reacted simultaneously at the temperatures set forth *in the presence of a surface catalyst and water.*" Claims #1 to #7 in the reissue patent present no important differences from the like-numbered claims in the original patent. Added Claims #8 and #9 (the claims at issue in the instant civil action) each use the word "water" but once, in the expression "to form oxidation products containing ethylene oxide *in the presence of water*" (Claim #8, page 2, column 1, line 35, and Claim #9, page 2, column 2, line 25). In reference to the use of "water", such verbs as "admitted" or "introduced", with the single exception first discussed above when the term "admitted" is most carefully qualified and restricted, are conspicuous by their absence from the reissue patent.

This brings us to what we regard as the most crucial problem in the case. Are Claims #8 and #9 of the reissue patent so vitally and so substantially different from the original patent as to invalidate these claims? We have just held that *there is a difference* here in that the original patent contemplated the voluntary introduction of water into the reaction-chamber (distinguished from the mere formation of water during the course of the reactions) as a step that would always be taken in the procedure therein set out while Claims #8 and #9 contain no such requirement, and indeed seem to negative clearly any such step. Is this difference vital, essential, substantial, material? Judge Coleman answered this question categorically in the negative, in his findings of fact number 7 and number 8. Under Civil Rules of Federal Procedure, Rule 52(a), 28 U.S.C.A. following section 723c, we can set aside these findings if, but only if, in our opinion the findings are "clearly erroneous." We do not think these findings are "clearly erroneous", so we must affirm them.

The Lefort process was one for the production of ethylene oxide, $C_2H_4O$, by a direct chemical combination between ethylene, $C_2H_4$, which is a hydro-carbon gas, and oxygen. The chemical formula for this conversion, as set out in the original patent

(page 1, column 1, lines 11-14), is thus written:

$$2\ \underset{1}{\underbrace{\begin{matrix} H_2C \\ \| \\ H_2C \end{matrix}}} + O_2 \longrightarrow 2\ \begin{matrix} H_2C \\ | \\ H_2C \end{matrix}\!\!\diagup O$$

This means that 2 molecules of ethylene plus molecular oxygen (2 atoms) will produce 2 molecules of ethylene oxide. This chemical formula had long been known. The difficulty was to find some practical process for bringing about the reaction prescribed by the formula. Some eminent chemists had stated that no such process would ever be found. The process described in Claims #8 and #9 of the reissue patent does constitute such a process, and there is no doubt of the real practical importance and the great commercial value of this process.

We think it is fair to state, in the light of the record in this case, that under the original patent, the essentially vital aspects of the process are (1) subjecting ethylene to the action of the oxygen of air; (2) in a reaction-chamber at controlled and specified temperature; (3) in the presence of a designated type of catalyst. The role of the water deliberately introduced into the reaction chamber was to increase and facilitate the efficiency of the reaction by diminishing the quantities of carbon dioxide and other undesirable by-products which might result from the reaction. Water would furnish a cheap and available heat-absorbing diluent. Lefort, of course, knew of the presence of some moisture in air. However, the original patent does not mention the quantity or proportion of water that was to be voluntarily introduced. There is mention, in the third modus operandi, of a "tube which has been filled with water"; but, just before the setting out of the three modi operandi, we find the statement: "Several modi operandi for carrying the process into practice, will be indicated hereinafter, by way of example only." The specifications of the original patent indicate the introduction "of a *suitable quantity* of water" (page 1, column 2, lines 15-16) and "if water is introduced in suitable quantity" (page 1, column 2, lines 35-36).

There are a very few differences between Claim #8 and Claim #9 of the reissue patent, and these differences are hardly of very great importance. Claim #8 mentions "a mixture containing ethylene and molecular oxygen"; Claim #9 adds to this the words "and a heat-absorbing diluent". Claim #8 mentions a "catalyst of a material having the catalytic characteristics of silver". In Claim #9 we find "catalyst material composed essentially of silver". Claim #8 ends "and thereafter recovering ethylene-oxide-containing product in liquid form". Claim #9 concludes "and thereafter separating ethylene oxide from the products of oxidation."

Claim #8 of the reissue patent is reproduced in full, with the numerals therein inserted by Judge Coleman to indicate the language covering the six steps embraced in the process: "In both claims 8 and 9, the process set forth for the production of ethylene oxide embraces six steps. We quote claim 8 in full, and have inserted numerals indicating the language in the claim which covers these steps: 'The process of making ethylene oxide by the direct chemical combination of oxygen with ethylene in the proportions of one atom of oxygen to one molecule of ethylene, which comprises (1) forming a mixture containing ethylene and molecular oxygen and (2) conducting said mixture through a confined reaction zone which is maintained at an elevated temperature; (3) controlling said temperature to maintain said mixture in said zone at a temperature between about 150° and about 400° C.; (4) subjecting said mixture in said zone at said elevated controlled temperature to intimate contact with an active surface catalyst of a material having the catalytic characteristics of silver which favors the direct oxidation of said ethylene in said mixture by said molecular oxygen to form oxidation products containing ethylene oxide in the presence of water, and which does not favor the existence in said products of substantial amounts of aldehydes; (5) correlating the passage of said mixture through said reaction zone in the presence of said catalyst and the controlled elevated temperature of said mixture and said catalyst to effect said oxidation of said ethylene directly to form substantial amounts of ethylene oxide; and (6) thereafter recovering ethylene oxide-containing product in liquid form.' "

This process is thus described by Judge Coleman in his opinion [34 F.Supp. 813, 815]: "Shorn of technical phraseology and summarized very briefly, the process may be described as consisting of the passage of

a mixture of ethylene gas and air through a tube containing a silver catalyst heated to a control temperature between approximately 150° and 400°. The direct combination of the air with the ethylene produces ethylene oxide. A side reaction also occurs in that there is destructive oxidation of some of the ethylene, producing carbon dioxide and water. It is claimed in the introductory statements of the patent that 'This process is characterized by an entirely unique reaction in which the direct addition of a single oxygen atom to the ethylene molecule occurs without the formation of significant amounts of other oxgenated compounds such as aldehydes.' That is to say, the product is claimed to be a notably clean one,—pure ethylene oxide, in readily recoverable form."

The expert testimony here strongly favors the contentions of the plaintiff. Professor Lamb, after a series of experiments, testified that one skilled in the art would, by following the original patent, successfully produce ethylene oxide, whether the introduction of water be regarded as mandatory or optional, and that he would obtain the same practical result by following the teachings of the reissue patent. In no uncertain terms, he gave his opinion, based upon his experiments conducted before he had ever seen the reissue patent, that, if it be assumed that the original patent required the introduction of water and the reissue patent omitted this requirement, this, from the technical viewpoint of chemistry, would not constitute a material or substantial variance. Professor Lamb remained at the trial and was recalled and asked by Judge Coleman: "Have you, since you testified, had a chance to study the reissue patent?" Professor Lamb replied: "Last evening I read it for the first time, so I have some familiarity with it." To the court's question "Well, then, do you feel you are in a position to testify more fully now from a scientific standpoint as to whether you find any material difference on this question that has been dwelt upon so much, the departure, in that water is required in the first patent and not in the second, as an addition?", Professor Lamb's reply was: "I certainly have not heard anything that has changed my ideas about water as an ingredient in this reaction."

The testimony of Professor Lamb was strongly confirmed by the evidence of Professors Frazer and Stevenson and of Dr. Curme, director of research for plaintiff. Professor Frazer stated emphatically: "In my judgment, the amount of water or the manner in which it was added was not the important thing at all. Speaking entirely as a chemist." Again, he stated: "As far as I could make out in regard to this question of water, it is a very much overworked topic."

The testimony of the experts introduced by defendant, we think, does not bear favorable comparison with the testimony of the experts introduced by plaintiff. Nor was defendant helped by virtue of the fact that Judge Coleman appointed Professor Frazer as an inter-partes expert witness in order that experimental tests might be made in advance of the trial and defendant produced no witness who had made, or who co-operated with Professor Frazer in making any inter-partes tests along the lines of either the original patent or the reissue patent.

Two points have been suggested to us, which, it is said, should heavily discount the value, in this connection, to the plaintiff of its expert witnesses in general, and of Professors Lamb and Frazer particularly. These are not merely ordinary men "skilled in the art". See U.S.C.A. Title 35, Section 33. They are superior supermen in the science of chemistry, to whom, in the light of their vast knowledge, the specifications and claims of a patent suggest possibilities that did not occur to the patentee and would not occur to the ordinary skilled man. Again, these super-chemists are primarily interested in the scientific chemical possibilities of a patent; but they have little interest or knowledge in the patent law and the monopoly thereby granted to an inventor, or in practical commercial considerations, such as the fact that if water, here, be voluntarily introduced into the reaction-chamber in appreciable quantity, the expense and trouble involved in heating this water to the desired temperature would materially enhance the costs of production. We have given due weight to these suggestions which, in our opinion, have some unquestioned force. Yet, even after such weight has been given, we still think their testimony, set against, and read in the background of, the entire record of the instant case, affords ample warrant for the findings by Judge Coleman.

■■ Defendant contends that the language of the patents here in suit is addressed to, and must be interpreted by,

"person[s] skilled in the art or science to which it appertains" (U.S.C.A. Title 35, Section 33), rather than by such super-chemists as the expert witnesses who testi-fied for plaintiff. In Seymour v. Osborne, 11 Wall. 516, at pages 545, 546, 20 L.Ed. 33, we find:

"Whether a reissued patent is for the same invention as that embodied in the original patent or for a different one is a question for the court in an equity suit to be determined as a matter of construction, on a comparison of the two instruments, *aided or not by the testimony of expert wit-nesses, as it may or may not appear that one or both may contain technical terms or terms of art requiring such assistance in ascertaining the true meaning of the lan-guage employed.* * * *

"Cases doubtless arise where the lan-guage of the specification and claim, both of the surrendered and reissued patents, is so interspersed with technical terms and terms of art that *the testimony of scientific wit-nesses is indispensable to a correct under-standing of its meaning.*" (The italics are ours).

The very field of the instant patents, catalytic chemistry, is a highly specialized one in which there have been developments that are many and important. The question of substantial variance vel non between the two patents, original and reissue, is close and troublesome due in no small measure to the difficulties involved not only in analy-tically interpreting and applying individual words of a highly technical nomenclature, *but also in mentally envisaging complex chemical processes in their entirety and in accurately and fairly comparing these pro-cesses when so envisaged.* We, according-ly, think our case falls squarely into the category described in Seymour v. Osborne.

■ Defendant attempted to make much of other French and British patents, which, like a scarlet thread, run through defend-ant's brief. Any adequate discussion of these foreign patents, in this connection, would unduly prolong this opinion. In answer to defendant's contention, however, that the reissue was largely an embodiment of the details set out in these foreign patents, it may be pointed out that the law-yer who had charge of the application for the re-issue patent testified, without contra-diction or impeachment, that he then had no knowledge whatever of the details of these foreign patents.

The specifications of the original patent, at the most, did not add to the elements called for by the claims, but merely con-tained an inadvertent error as to one step in the process (i. e., the voluntary introduction of water), and that not one of the most im-portant steps, in the process by which these elements were to be brought into functional relation. A reissue patent would seem to be a proper method for the correction of such an error. And, if claims #8 and #9 of the reissue patent had been added to the claims of the original patent, we do not believe these claims could have been held to be in-valid on the ground that these claims were not sufficiently covered by the specifications of the original patent.

### Minor Defenses

We regard the issue of a substantial variance between the original patent and the reissue patent as the vital question in-volved in this appeal. Having resolved that question in favor of the plaintiff, we now proceed to certain minor defenses set up by defendant. Judge Coleman, in his opinion, considered and dealt with these minor defenses at some length. He de-cided that all of them were lacking in merit. We believe all these rulings to be correct and the reasons on which they were based to be sound. We shall advert somewhat briefly to each of these minor defenses.

■ Defendant attacks the validity of the original patent on the ground that un-der the prior art this patent lacks patent-able novelty. Even a cursory reading of the testimony of Professor Lamb, Pro-fessor Stevenson and Dr. Curme should effectively silence this contention. The Lefort process provided a practical and original solution to a problem that had long baffled industrial chemists. We certainly do not believe that the original patent was anticipated by the McElroy patents, for the McElroy patents were demonstrated to be quite unworkable in any practical com-mercial sense, and these patents fail to dis-close the essential features of Lefort's original patent.

■ The federal Reissue Statute, Rev. St. § 4916, 35 U.S.C.A. § 64, permits a re-issue patent only if error in an original patent "has arisen by inadvertence, acci-dent, or mistake, and without any fraudu-lent or deceptive intention." The evidence amply sustains the finding of the United

States Patent Office (see Topliff v. Topliff, 145 U.S. 156, 12 S.Ct. 825, 36 L.Ed. 658), affirmed by Judge Coleman, that the conditions set out in the Reissue Statute have been adequately satisfied here. There is little force in defendant's contention that the claims and specifications of the original patent were fraudulently or deceptively made vague and indefinite. Unusually convincing in this connection, are the testimony of plaintiff's attorney and the affidavit of the French attorney. This seems to be a typical case of a valid, original basic patent, in which the claims were inadvertently drawn in terms that were too narrow and these claims were, accordingly, subject to valid correction under a reissue patent.

Another contention is that Claims #8 and #9 of the reissue patent specify the catalysts only in terms of function. The testimony of Professor Lamb disposes of this contention. He was amply confirmed here by Professor Stevenson's evidence, and particularly the testimony of the latter dealing with the literature of silver catalysts, including the notable contributions on that subject of Professor Benton (a catalytic chemist of outstanding distinction) and Mr. Elgin. Nor was there much encouragement to defendant here in the testimony of its own expert, Mr. Ray Carter. We have no reasonable doubt that the description of the catalyst would be entirely sufficient to enable one versed in the art to follow satisfactorily the outlined process.

Defendant asserts that plaintiff has failed to disclaim claims #2, #4, #5, #7 of the reissue patent, though the invalidity of these claims was brought to the attention of the plaintiff in the answer of the defendant, and that this fact makes the reissue patent invalid in its entirety. These claims have never been adjudged to be invalid, nor do we think their invalidity is clearly apparent upon an inspection of the patent. The approval of these claims by the Patent Office would seem to raise some presumption, until the contrary appears, that the claims are valid. It is at least open to very serious doubt whether "the making of the invalidity of these claims obvious" by a mere assertion to that effect in its answer would relieve the defendant from liability for infringement of claims #8 and #9 committed prior to the filing of this answer. Claims #8 and #9 (not the narrower claims #2, #4, #5, #7) form the basis of the instant action.

Said Judge Coleman on this point: "A patent will not be invalidated for mere failure on the part of the patentee to disclaim prior to some judicial decision upon the subject matter, i. e., upon one or more of the claims, of the patent. After that, the patentee must act with diligence in accordance with the result of the adjudication." And in Robinson on Patents (1890) vol. 2, page 284, we find the following language, cited with approval in Ensten v. Simon, Ascher & Co., 282 U.S. 445, 453, 51 S.Ct. 207, 209, 75 L.Ed. 453. "In cases where the excess is not apparent at once upon the inspection of the patent by the patentee, the allowance of his claim by the Patent Office raises such a presumption in its favor that he may rely upon its validity until a court of competent·jurisdiction decides that it is broader than his real invention." The cases of Ensten v. Simon, Ascher & Co., 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453; Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949; Maytag Co. v. Hurley Machine Co., 307 U.S. 243, 59 S.Ct. 857, 83 L.Ed. 1264; Radio Condenser Co. v. General Instrument Corp., 2 Cir., 65 F.2d 458 (cited in the brief of defendant); do not go beyond what is written above. Hence, they do not sustain the interpretation sought to be placed upon them by the defendant.

If Claims #8 and #9 of the reissue be valid (and we do so hold), we think there can be little doubt of infringement by defendant. Indeed, we do not believe defendant's contention to the contrary was very seriously urged. The deadly parallel between the process of the reissue patent and the process employed by defendant, set out in plaintiff's exhibits #8 and #9, which was not successfully contradicted by defendant, is quite sufficient here.

Defendant's last defense is in the nature of an attempt to invoke against plaintiff an equitable estoppel, based largely on expenditures by defendant before the issuance of the reissue patent. Defendant is here clutching for a very feeble straw. Sontag, etc., Co. v. National Nut Co., 310 U.S. 281, 60 S.Ct. 961, 84 L.Ed. 1204, and Otis Elevator Co. v. Atlantic Elevator Co., 2 Cir., 47 F.2d 545, are clearly distinguishable on the facts from the instant case. The expenditures in question were largely for experimental purposes. Even as to these, the evidence is far from clear as to

just how much money was expended before, and just how much after, the application for the reissue patent. As Judge Coleman observed: "But it appears that defendant never began to construct its present costly plant until after the reissued patent had been granted; and never began to operate it commercially for the production of ethylene oxide until more than two years later. It is a correct inference from the testimony that prior to the application for the reissued patent, defendant's work on this process amounted to relatively little, but that thereafter, defendant zealously progressed its development of plant and process, with a view to capitalizing what plaintiff had done."

### General Considerations

We believe that what might be called the general equities here strongly favor the plaintiff. A French inventor, Lefort, made a discovery of great scientific importance and unquestioned commercial value. Plaintiff acquired the original patent, which was perfected by a reissue patent. It cannot fairly be said that plaintiff merely bought a lawsuit or tried to play the role of a dog in the manger. And this is true, even though there may have been some doubt as to the validity of the patents in question.

On the other hand, the activities and expenditures of defendant in connection with ethylene oxide were comparatively slender before application was made for the reissue patent. The erection of defendant's elaborate plant in Baltimore after the issuance of the reissue patent, and defendant's elaborate activities thereafter were all in the nature of a gamble on the invalidity of the reissue patent by the defendant's officers, who hoped, if they were thus fortunate, to prosper by the appropriation of the intellectual property of another. If, through over-hasty action, this chance broke against defendant, we see little need for the shedding of any crocodile tears over the misfortune thus brought on the defendant.

Finally, we are impressed by the general nature of the defenses set out at length by the defendant in a desperate effort to escape the consequences of a palpable infringement. These defenses, terribly technical in the extreme, contain little or no appeal to the beneficent principles of equity and good conscience.

For the reasons set forth above, we affirm the judgment of the District Court.

Affirmed.