## U. S. INDUSTRIAL CHEMICALS, Inc., v. CARBIDE & CARBON CHEMICALS CORPORATION.

District Court, S. D. New York.

May 15, 1946.

See also 52 F.Supp. 164.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds, Frank E. Barrows, and Roger T. McLean, all of New York City, of counsel), for plaintiff.

Watson, Bristol, Johnson & Leavenworth, of New York City (L. A. Watson, C. V. Johnson, and T. R. V. Fike, all of New York City, of counsel), for defendant.

COXE, District Judge.

This is a suit for a declaratory judgment decreeing that the Lefort reissue patent, No. 22,241, issued December 29, 1942, for a process for the production of ethylene oxide, owned by the defendant, is invalid and void as to all claims and not infringed by the plaintiff.

The plaintiff is the owner of a large plant at Baltimore, Maryland, which, for a considerable period prior to November 1942, was engaged in the production of ethylene oxide according to a process now asserted by the defendant to be an infringement of the patent. This plant was shut down in November 1942, because of conditions resulting from the war, and has since been out of commission. It is, however, the intention of the plaintiff to resume operations at the plant as soon as these conditions permit, using the same process for the production of ethylene oxide as formerly employed. The defendant has notified the plaintiff that any operation using this process will be considered an infringement of the patent, and the present suit for a declaratory judgment has been brought by the plaintiff to determine the controversy between the parties.

The complaint alleges that an actual controversy exists between the parties with respect to the patent, and specifies various

grounds for the relief sought. Included in these grounds are the usual patent defenses of anticipation, lack of invention and non-infringement, together with a number of other defenses such as insufficient specification, patent office 'estoppel, failure to disclaim, and intervening rights.

The answer challenges the jurisdiction of the court to entertain the suit for a declaratory judgment, sets up a counter-claim alleging infringement of claims 2 and 3 of the patent, and prays for an injunction against infringement and further threat of infringement.

The patent is a second reissue of the original Lefort patent, No. 1,998,878, issued April 23, 1935, on an application filed March 22, 1932. This original patent had seven claims, and the application was based on earlier French patents applied for and obtained by a French corporation known as Societe Francaise De Catalyse Generalisee, with which Lefort was connected. The United States patent was purchased by the defendant in April 1936, and assigned to that company on August 18, 1936. On September 25, 1936, Lefort, at the instigation of the defendant, applied for a reissue, and on May 18, 1937, the first reissue, No. 20,370, was granted. This reissue contained a rewritten specification, and added two new claims, Nos. 8 and 9, to the seven claims of the original patent.

The first reissue was the subject of a prior suit between the parties in the District Court in Maryland, involving the operations then being conducted by the plaintiff at its plant in Baltimore. In this suit, the two new claims of the reissue, Nos. 8 and 9, alone were in issue. The suit was tried at Baltimore in June 1940, and resulted in an interlocutory decree adjudging claims 8 and 9 of the reissue valid and infringed. Carbide & Carbon Chemicals Corp. v. U. S. Industrial Chemicals, D.C., 34 F.Supp. 813. This decree was affirmed by the Circuit Court of Appeals for the Fourth Circuit, United States Industrial Chemicals v. Carbide & Carbon Chemicals Corp. 121 F.2d 665, but was later reversed by the Supreme Court on the ground that the reissue was not for the same invention described and claimed and intended to be secured by the original patent. U. S. Industrial Chemicals Co. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105. A final judgment on the mandate of the Supreme Court was accordingly entered by the District Court in Maryland on May 18, 1942, vacating the previous interlocutory decree, adjudging claims 8 and 9 of the reissue invalid, and dismissing the complaint.

On May 14, 1942, the defendant filed a disclaimer of claims 8 and 9 of the reissue, stating that it was filing simultaneously an application for a second reissue with claims as therein specified. Some delay was thereafter encountered in obtaining the signature and oath of Lefort to the application for the further reissue, and it was not until September 18, 1942, that the papers were accepted for filing by the Patent Office. The second reissue was granted on December 29, 1942, with a specification similar to that of the original patent, and containing three claims designed to meet the criticisms of the Supreme Court with respect to the first reissue.

In the meantime, the plaintiff's Baltimore plant had been shut down, and it was thought that some foundation for the institution of the present suit should be laid by the actual practice of the accused process after the issuance of the second reissue. The plaintiff accordingly set up a small unit for the production of ethylene oxide at its plant at Stamford, Connecticut, and during a period of seven or eight days in February, 1943, this unit was operated, and produced between four and eight gallons of the product, using the same process theretofore employed in the Baltimore operations. A sale of a gallon of the product was subsequently made in regular course through the plaintiff's New York office prior to the commencement of the suit.

The following is a brief description of the three United States Lefort patents:

*Original patent No. 1,998,878:*

The original patent disclosed a Catalytic process for the direct oxidation of ethylene, which consisted generally in passing a mixture of ethylene, oxygen and water over a prescribed catalyst in a confined re-

action chamber at a temperature between 150 and 400 degrees C to produce ethylene oxide. It was also disclosed that as an incident to the operation of the process there was a side reaction in which a portion of the ethylene was converted into water and carbon dioxide. The specification mentioned a large number of metals, including silver, and their mixtures, for use as alternative catalysts, but silver alone was suggested as the catalyst in two of the three modi operandi given as examples. In its analysis of the patent in the prior suit, the Supreme Court referred to various parts of the specification and claims relating to the introduction of water as an essential step in the process, and these references need not be repeated. The court held that the voluntary introduction of water into the reaction chamber was mandatorily required by the patent, and that this was so notwithstanding the presence of water in the reaction chamber resulting from the side reaction producing water and carbon dioxide.

### First reissue No. 20,370:

The first reissue in its rewritten specification stated that the process "can be conveniently conducted by passing a mixture containing air and ethylene through a tube * * *"; it treated the voluntary introduction of water into the reaction chamber as merely permissive. The catalyst was described as a "surface catalyst * * * composed of silver in finely divided form"; but it was stated that "other metals such as bismuth and antimony may be used," and, further, that "experiments have also indicated that the catalyst may be silver activated by the addition of small amounts of gold or copper or iron." The use of the various other metals (including gold, copper and iron), as alternative catalysts mentioned in the original patent, was expressly disclaimed by Lefort in his supplemental oath to the application for the reissue verified March 30, 1937. The new claims, Nos. 8 and 9, called for "a mixture containing ethylene and molecular oxygen," but said nothing about the voluntary introduction of water as a necessary step in the process. The Supreme Court held that these claims were invalid because they omitted the voluntary introduction of water as required by the original patent

### Second reissue No. 22,241:

The second reissue now in suit contains a specification substantially identical with the specification of the original patent, except that it eliminates the various metals as alternative catalysts disclaimed by Lefort in his supplemental oath of March 30, 1937. The three claims of the reissue are as follows:

"1. A process for the production of ethylene oxide, consisting in subjecting ethylene to the simultaneous action of oxygen and water at a temperature between 150 degrees and 400 degrees C. in the presence of a catalyst composed of silver activated by small quantities of a metal selected from a group consisting of gold, copper and iron.

"2. A process for the production of ethylene oxide, consisting in subjecting ethylene to the simultaneous action of oxygen and water at a temperature between 150 degrees and 400 degrees C. in the presence of a catalyst composed essentially of silver to form ethylene oxide substantially without aldehydes.

"3. The process of making ethylene oxide by the direct chemical combination of oxygen with ethylene in the proportions of one atom of oxygen to one molecule of ethylene, which comprises introducing a mixture containing ethylene, molecular oxygen and water into a reaction vessel wherein the ethylene is subjected to the simultaneous action of the oxygen and the water; conducting said mixture through a reaction zone; controlling the temperature of said zone to maintain said mixture therein at a temperature between about 150 degrees and 400 degrees C.; subjecting said mixture in said zone to intimate contact with an active surface catalyst material composed essentially of silver which favors the direct oxidation of said ethylene in said mixture by said molecular oxygen to form oxidation products containing ethylene oxide in the presence of water and which does not favor the existence in said products of substantial amounts of aldehydes; correlating the passage of said

mixture through said reaction zone in the presence of said catalyst and the controlled elevated temperature of said mixture and said catalyst to effect said oxidation of said ethylene directly to form substantial amounts of ethylene oxide; and thereafter recovering ethylene oxide-containing product."

Claim 1 is identical with claim 1 of the original patent. Claim 2 is the same as claim 1 of the original patent with respect to water, but is broader than the claims of the original patent with respect to the catalyst. Claim 3 is adapted from claim 9 of the first reissue, and does not differ from claim 1 of the present reissue with respect to water; it is, however, broader than the claims of the original patent with respect to the catalyst.

Plaintiff's Process.

The plaintiff's process is described in a statement made by the plaintiff (then defendant) in the Baltimore suit, and which formed the basis of the charge of infringement in that litigation. This statement is an exhibit (Pltf's Ex. 7) in the present suit, and has been accepted by both parties as a description of the plaintiff's process. According to this statement, the plaintiff employed in the Baltimore operations "a chamber containing a catalyst consisting of silver disposed upon a carrier of aluminum oxide bonded by a fusion process"; through this chamber "a gaseous mixture containing ethylene and the constituents of atmospheric air" was passed in intimate contact with the catalyst; and during the operation the temperature within the chamber was maintained between about 150 and 400 degrees C. The statement continues: "The gaseous mixture entering the chamber contained usually about 1.5% by volume of water vapor, not exceeding 1.7% by volume at any time"; and the "resultant gaseous mixture" leaving the chamber after the reaction had taken place "contained usually about 3.5% by volume of water vapor not exceeding 3.7% by volume at any time." The process described in the statement was closely followed in the Stamford operation in February 1943, and is shown in detail in the schematic drawing (Deft's Ex. 45) made by Dr. Stevenson, the defendant's expert.

1. I think the court had jurisdiction to entertain the suit. When the patent in suit was issued on December 29, 1942, the plaintiff's Baltimore plant was no longer in operation, but on January 25, 1943, the defendant wrote the plaintiff that "any present or future operation" of the process set forth in the statement in the Baltimore suit would be considered an infringement, and proceeded against by suit for injunction and accounting. The plaintiff made no response to this letter, but in February 1943, practiced the process on a small scale at its plant in Stamford, and then commenced the present suit. The plaintiff frankly admitted at the trial that this Stamford operation was "for the purpose of using it as a basis for a suit." But even without the Stamford operation there still was a justiciable "controversy" with respect to the patent, and all that the Stamford operation did was to reinforce the plaintiff's intention to reopen the Baltimore plant as soon as the war conditions permitted.

The complaint alleges that the plaintiff had this intention, and it was largely on that ground that Judge Goddard upheld the jurisdiction on a motion made by the defendant to dismiss prior to the trial. U. S. Industrial Chemicals v. Carbide & Car Chemicals Corp., D.C., 49 F.Supp. 345. The evidence in no way impugns this decision. Indeed, the defendant admits as much in its brief, for it asks not only that the complaint be dismissed, but that jurisdiction be retained to adjudicate the counterclaim for infringement of claims 2 and 3 of the reissue.

2. On the merits, the plaintiff first insists that its process avoids infringement because it omits the voluntary introduction of water, which, the Supreme Court held in the prior suit, was a mandatory requirement of the original patent. In the plaintiff's process, only ethylene and air are introduced into the reaction chamber; the ethylene is ordinary ethylene, and the air is ordinary atmospheric air containing "usually about 1.5% by volume of water vapor, not exceeding 1.7% by volume at any time." It is the contention of the plaintiff that introducing atmospheric air is not introducing water in accordance with the

disclosure of the original patent, and is not, therefore, within the protection of the reissue.

The plaintiff rests its argument on this branch of the case largely on the construction placed by the Supreme Court on the original patent in the prior suit. Thus, at page 673 of 315 U.S., at page 842 of 62 S.Ct., the Supreme Court stated that experiments conducted by the present defendant before it acquired the original patent demonstrated that ethylene oxide could be produced "by passing ethylene and air over a catalyst at a temperature described in the patent without the voluntary introduction of water." This would seem to be a clear expression by the Supreme Court that it regarded the introduction of air as outside the limits of the description in the original patent requiring the voluntary introduction of water. At page 675 of 315 U.S., at page 843 of 62 S.Ct., it was stated, with respect to the specification of the first reissue: "The description of the mode of conducting the process differs from all those given in the original specification in omitting the introduction of water." In the specification of the first reissue, it is pointed out that it is "desirable to maintain the temperature of the zone of reaction within the range specified," and, further, that "This can be facilitated by a suitable dilution of the reaction gases, such as that accomplished by the use of air as a source of oxygen * * *." It is then stated that the process "can be conveniently conducted by passing a mixture containing air and ethylene through a tube * * *." This, the Supreme Court said, differed from the process of the original patent "in omitting the introduction of water." At page 680 of 315 U.S., at page 845 of 62 S.Ct., the Supreme Court used the following language in disposing of the argument of the then respondent (present defendant) that the reissue and the original patent were for the same invention because the described introduction of air in the reissue effected also the introduction of water:

"In the argument on the merits in this court, the respondent shifted its position. In brief and argument it stated that both the original and reissue cover the same invention, for, if both require the intro-duction of water, the described introduction of air effects also the introduction of water since atmospheric air contains both oxygen and moisture. It is thus sought to avoid the finding of the Circuit Court of Appeals that the original patent called for the voluntary introduction of water and the reissue does not. This argument fails to square with the specification or claims of either the original patent or the reissue. The claims of the original patent are not limited to the oxygen of air; and the specification merely says the oxygen 'can be the oxygen of air.' The specification and claims of the reissue are satisfied by the introduction of dry oxygen".

In the above quoted passages of the opinion, the Supreme Court was clearly referring to "air" as meaning atmospheric air, and I think the language used plainly indicates a construction of the original patent which excludes the plaintiff's process. The last sentence of the quotation at page 680 of 315 U.S., at page 845 of 62 S.Ct., is not in conflict with this interpretation, for this sentence held merely that the first reissue contained no mandatory requirement for the voluntary introduction of water, and was, therefore, satisfied by the introduction of dry oxygen.

But even without this construction of the original patent by the Supreme Court, I find nothing in the original patent which shows an intention to secure patent protection for the process of introducing ethylene and atmospheric air only. The specification speaks merely of the introduction of water, "either in liquid state, or as steam"; it nowhere mentions or even suggests that atmospheric air may be used for the purpose. Moreover, great emphasis is placed in the specification on the part that water is intended to play in the process. Thus, it is pointed out that water increases the efficiency of the reaction, checks the side reaction giving carbon dioxide, completely checks the side reaction if used with carbon dioxide, and considerably promotes the reaction ensuring the production of ethylene oxide. And in modus operandi I it is stated that water is to be pumped into the reaction chamber by means of a circulating pump, and in modus operandi III that the reaction chamber is to be filled

with water. All of these stated purposes necessarily required the introduction of large amounts of water—certainly far more than obtained by the use of atmospheric air. This is clearly evidenced by statements in the French patent, No. 771,-650 (Pltf's Ex. 67) taken out on July 30, 1934 by the same French corporation which then owned the earlier French patents and the application for the original United States patent. Reference was there made to "the necessity of vaporizing large amounts of water" in the process of the earlier French patents, and this was characterized as a "drawback" in the process, which the new invention sought to remedy by substituting for the large amounts of water an inert gas amounting to 66% of the mixture.

■ 3. The plaintiff next contends that the specification of the patent in suit is insufficient in that it fails to make a disclosure in "full, clear, concise, and exact terms" as required by the statute (35 U.S. C.A. § 33). The main criticism is directed against the catalyst, and, although other parts of the specification are also under attack, it will be sufficient for the present purpose to confine the discussion to the catalyst. What a specification must contain is well stated by Judge Learned Hand in Health Products Corp. v. Ex Lax Mfg. Co., 22 F.2d 286, 287, as follows:

"It is scarcely necessary to labor the principle that specifications must be more than a suggestion for promising experiment, hit or miss. They must contain complete directions, leading with certainty to the result."

I do not think that the specification meets the test laid down in the Health Products case with respect to the catalyst. The specification states that various metals, including silver, may be used for the catalyst, but the only information regarding the form of the catalyst is that when silver is used it should be "in powder form, or in the form of a wire gauze," or that it should be a "silver colloid." In the form of a wire gauze, a silver catalyst was shown to be ineffective, and there is no evidence that a silver catalyst in powder form, or as a silver colloid, is of any value.

The specification does not suggest that the catalyst be silver in "finely divided form", and a skilled worker is left to independent research to ascertain the form which will produce the desired result.

The absence in the specification of specific information regarding the catalyst is well illustrated by the experience of the Dutch Shell interests in Holland and in California in 1933 in investigating the Lefort process with a view to a possible purchase of a license to manufacture the product in the United States. The Dutch Shell interests had before them at the time not only the application for the original United States patent, but also additional information given to them directly by representatives of the French corporation which owned the United States application. This additional information included the use of a silver catalyst instead of the other metals listed in the application, and the relative proportions of the entering gases, and the amount of water to be introduced in the mixture. The documents in evidence show, however, that information as to the composition of the catalyst was refused by the French corporation.

The Dutch Shell's investigation in Holland covered a period of over six months, and the investigation in California extended over a month. During the investigation, extensive laboratory tests were made, both in Holland and in California, at which many different catalysts were tried without any appreciable results, until by repeated experimentation a way was found for preparing the catalyst which gave promise of successful utilization. In the meantime, the French corporation was pressing the Dutch Shell in Holland for action in the negotiations looking towards the acquisition by Dutch Shell of the United States license, and correspondence on the subject passed between the parties. On September 13, 1933, the French corporation wrote to Dutch Shell in Holland complaining about the delay in the California investigation, and stated as follows:

"You tell us that they are doing research which will require still more time; that is what we do not understand, and we would like to know why their research takes such

a long time. What research can they be doing?"

"Either this research concerns our patents, and in this case your California friends should have made up their minds. Or this research is of a technical nature, your friends for example are doing experiments; and if that is the case, we are then obliged to tell you that with the data they have on hand they will not be able to obtain satisfactory results."

"Without complementary explanations from us as to the tricks of the catalyst, any experiments which they make can only be the cause of considerable loss of time."

This is a frank admission by the French corporation of deliberate withholding of essential information regarding the catalyst, and it explains the difficulty encountered by the Dutch Shell interests in their efforts to follow the teaching of the application. Featheredge Rubber Co. v. Miller Rubber Co., 6 Cir. 259 F. 565; Rohm v. Martin Dennis Co., 3 Cir., 263 F. 388.

The defendant says, in answer to the plaintiff's contention that the specification is insufficient, that four "workers" independently of each other followed the disclosure of the patent and produced ethylene oxide. The first two of these four workers are Drs. Lamb and Frazer, both distinguished chemists, whom the Circuit Court of Appeals in the Fourth Circuit characterized as "superior supermen in the science of chemistry, to whom, in the light of their vast knowledge, the specifications and claims of a patent suggest possibilities that did not occur to the patentee and would not occur to the ordinary skilled man." United States Industrial Chemicals v. Carbide & Carbon Chemicals Corp., 4 Cir., 121 F.2d 665, 670. Dr. Lamb conducted his tests in 1940 with a copy of the original patent to guide him. He insisted that in making the tests he used only such knowledge as he had in 1931. Yet he was one of the experts in the Baltimore suit of whom the Circuit Court of Appeals said: "They drew not only upon their vast store of technical knowledge, but they used, too, what developments (and these were far from inconsiderable) had been made in the whole field of the Lefort patent since application for this patent was made by the inventor." United States Industrial Chemicals v. Carbide & Carbon Chemicals Corp. (supra), p. 668. Dr. Lamb did not follow the Lefort patent in at least two respects; he introduced no water, and he employed a special procedure for the preparation of the catalyst not suggested by the patent. Dr. Frazer made no tests himself but was merely present at the defendant's plant just prior to the Baltimore trial, and witnessed informatory demonstrations of the defendant's process there preparatory to testifying as a witness.

The second two of these four "workers" are Law, a chemist employed by the defendant, and Carter, a chemist employed by the plaintiff. Law conducted his first tests under the patent in February and March, 1936, and when he used a silver catalyst in the form of a wire gauze as described in the specification, he failed to obtain any ethylene oxide. It was only after further experimentation in which he departed from the patent that he was able to get some results. Carter did his experimental work over an extended period during which he made many tests. In one of the early tests in December 1935, he used as the catalyst silver rivets with a "mat surface acquired by previous catalytic use in another process," and obtained a small amount of ethylene oxide while operating at a temperature between 417 and 425 C. Prior to their experiments, both Law and Carter had seen copies of Lefort's patents, and were familiar with the literature relating to catalytic oxidation, yet neither of them was able to find in the specification anything "more than a suggestion for promising experiment, hit or miss." Health Products Corp. v. Ex Lax Mfg. Co. (supra) 22 F.2d p. 287.

I hold, therefore, that the court has jurisdiction of the action, that the plaintiff's process does not infringe claims 2 and 3 of the second reissue, and that the second reissue is invalid for insufficiency of specification; and with this disposition it will be unnecessary to pass on the other defenses to the patent asserted by the plaintiff.

902

There may be a decree declaring that the plaintiff's process does not infringe claims 2 and 3 of the Lefort reissue patent No. 22,241, and that all claims of the Lefort reissue patent, No. 22,241, are invalid for insufficiency of specification, with costs to the plaintiff.